688 A.2d 584

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ROBERT McQUAID, DEFENDANT–APPELLANT.

Argued October 8, 1996—Decided February 19, 1997.

465

466

*Steven M. Gilson,* Designated Counsel, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Bennett A. Barlyn,* Deputy Attorney General, argued the cause for respondent (*Peter G. Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal addresses the denial of defendant's second petition for post-conviction relief (PCR) filed approximately seven years after his guilty plea to felony murder and theft. Defendant, Robert McQuaid, based his second PCR petition largely on a claim of ineffective assistance of counsel, alleging that he had pled guilty because of the erroneous advice that if tried and convicted of the pending charges he could be subject to the death penalty. The Appellate Division upheld the trial court's denial of PCR based on the procedural bar of *Rule* 3:22–5, which deems conclusive a prior adjudication on the merits of any grounds for relief asserted.

I

We base our recitation of the pertinent facts primarily on defendant's admissions at his plea hearing and during a confession made several days following the murder. On December 8, 1982, defendant and a friend, Lawrence Woodward, sought to burglarize the Barrington, New Jersey home of Beatrice Watson. Defendant knew Watson from previous odd-jobs he had performed for her. For several weeks, the two men had watched the house in order to determine an appropriate time for the burglary. On the day of the crime defendant and co-defendant Woodward believed that the home would be unoccupied. Defendant approached the back door of the house and knocked. Unexpectedly, Watson answered the door. Defendant showed her a knife and told her to let him in, informing her that she should say nothing and would not be hurt. He backed her into the living room where he told her to lie face

down on the couch. Woodward entered the house and defendant told him to find some tape and tie up the victim. After Woodward tied the victim with surgical tape, the two men ransacked the house.

While looking through bedroom drawers, defendant found a .38 caliber revolver. Defendant gave the gun to Woodward. The two men discussed whether to kill the victim in order to prevent her from identifying them. A pillow was placed over the victim's head. Woodward shot the victim twice after defendant said he could not shoot her. Following the shooting, the two men fled the scene with a pillowcase containing the few valuable items they had found. They drove to Philadelphia and stayed for two days. Defendant sold the items taken from the Watson home at a Coin Exchange store for approximately $200, and sold the gun for drugs. Defendant gave Woodward $80 to $100 as his share of the burglary proceeds. While in Philadelphia they also visited defendant's uncle.

On December 10, 1982, defendant and Woodward drove to New Jersey to return the car used during the burglary, which they had borrowed from a friend. At the friend's home, they spoke with Gary Cumens. Cumens had just read an article in a newspaper about the killing of Beatrice Watson, and knew that defendant had previously worked for her. Cumens asked defendant about the killing and defendant admitted that they had committed the burglary and had killed the victim.

Later that day, defendant and Woodward broke into a Haddonfield home. Defendant cut through a screen and broke the glass in the back door. Defendant searched the house and found an unloaded single barrel shotgun in a closet. When Woodward shouted that the police were outside, the two men separated and fled. Defendant escaped from the home through a basement window, carrying a pillowcase containing stolen goods. While running, he dropped the pillowcase. Defendant was apprehended by the police several blocks from the burglarized home.

On December 17, 1982, both defendant and Woodward made sworn statements to the police regarding the burglaries and the murder of Beatrice Watson. The two statements were consistent in detailing how they had planned the Watson burglary for several weeks before committing the crime. Both men stated that they went to a supermarket to procure gloves and a knife just before driving to the Watson house. Their statements differed somewhat regarding the decision to kill the victim. Woodward claimed defendant told him to kill the victim because she could identify defendant. He stated that defendant emphasized that he did not want to return to jail because he knew he would receive a long sentence. Woodward also claimed that defendant gave him the pillow and told him to shoot the victim through the pillow in order to muffle the sound. Defendant stated that they had previously discussed killing the victim, if necessary. Defendant claimed that, while defendant was in a different room, Woodward threatened and then killed the victim after defendant gave him the gun.

Other evidence acquired by the police included a sworn statement by Gary Cumens, which indicated that two days before the killing he had driven past the victim's home with the two defendants and heard them discuss their plan to burglarize the home. Cumens reported that defendant later admitted to him that he and Woodward had killed the victim. Cumens also stated that defendant informed him that defendant had told Woodward to go ahead and kill her while he went into another room.

The police went to the Philadelphia store where defendant had sold the items stolen from the victim's home. With the signed receipt retained by defendant, police detectives recovered the stolen items, including a silverware set engraved with the initial "W". Additionally, the police recovered the gun registered to the victim. The police spoke with defendant's uncle who confirmed the presence of the two men in Philadelphia during the two days following the murder. The uncle stated that defendant and his friend stayed overnight in a small silver car, which matched the description of the car defendant admitted to borrowing on the day

of the murder. The police also located a witness who, on the day of the killing, saw the car used by defendant parked around the corner from the victim's home.

In December 1982, a grand jury indicted defendant on a total of fifteen charges. Those charges were: murder by his own conduct, *N.J.S.A.* 2C:11–3a(1), –3a(2), –3c (count one); murder as an accomplice by procuring the commission of the homicide by payment or promise of payment of anything of pecuniary value, *N.J.S.A.* 2C:11–3c (count two); aiding and abetting the murder, *N.J.S.A.* 2C:5–1, 11–3c (counts three and four); felony murder, *N.J.S.A.* 2C:11–3a(3), –3c (count five); conspiracy to commit murder, *N.J.S.A.* 2C:5–2 (count six); first-degree robbery, *N.J.S.A.* 2C:15–1b (count seven); second-degree burglary, *N.J.S.A.* 2C:18–2b (count eight); conspiracy to commit robbery and/or burglary, *N.J.S.A.* 2C:5–2 (count nine); hindering apprehension or prosecution, *N.J.S.A.* 2C:29–3a(3) (counts ten, eleven, and twelve); possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a, –4d (counts thirteen and fourteen); and possession of a handgun, *N.J.S.A.* 2C:39–5b (count fifteen).

The Camden County Prosecutor filed a Notice of Aggravating Factors, pursuant to *N.J.S.A.* 2C:11–3c(2)(e) and *Rule* 3:13–4(a), thereby designating defendant's prosecution as a death penalty case. The enumerated factors were: (1) the murder was outrageously or wantonly vile, horrible or inhuman, *N.J.S.A.* 2C:11–3c(4)(c); (2) the murder was committed for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f); (3) the murder was committed while the defendant was engaged in the commission of a robbery and/or burglary, *N.J.S.A.* 2C:11–3c(4)(g); and (4) the defendant procured the commission of the murder by payment or promise of payment, *N.J.S.A.* 2C:11–3c(4)(e).

In February 1983, a second grand jury indicted defendant on six charges related to the Haddonfield burglary. Those charges were: fourth degree aggravated assault—by pointing a firearm, *N.J.S.A.* 2C:12–1b(4) (count one); second-degree burglary, *N.J.S.A.* 2C:18–2 (count two); third-degree theft by unlawful

taking or disposition, *N.J.S.A.* 2C:20–3 (count three); second degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4 (count four); third-degree unlawful possession of a weapon (shotgun), *N.J.S.A.* 2C:39–5(c)(1) (count five); and conspiracy to commit burglary, *N.J.S.A.* 2C:5–2 (count six).

Defense counsel represented defendant for close to a year and a half. At the plea hearing, counsel noted that he had had numerous conferences with defendant discussing the potential consequences of both a guilty plea and a conviction after trial. He acknowledged that defendant was charged with a capital crime and faced the possibility of a death sentence. In the course of a colloquy with the court, he expressed the view that defendant, if convicted on all charges, faced a potential sentence of life with sixty years parole ineligibility.

After substantial negotiations between defense counsel and the prosecutor, the State offered defendant a plea bargain. Defendant accepted. Based on the plea agreement, defendant entered a *retraxit* guilty plea to one count of felony murder. In exchange, the State agreed to seek dismissal of the remaining fourteen counts related to the murder indictment and recommend a sentence of forty years imprisonment with thirty years of parole ineligibility. Additionally, defendant pled guilty to one count of theft under the second indictment. The State also agreed to seek dismissal of the remaining five counts and to recommend a concurrent ten-year term of imprisonment with a five-year period of parole ineligibility.

During the plea hearing, defendant, defense counsel and the trial court made reference to defendant's death eligibility. On four separate occasions defendant stated that it was his understanding that if he were to plead not guilty and stand trial on the charges against him he might be convicted of murder and receive the death penalty. The trial court questioned defendant to ensure that he understood the penalties for theft and murder. When asked if he understood the maximum penalty to which he would be subject if convicted, defendant stated, "I get the death penalty."

At the plea hearing, defendant expressed dissatisfaction with his legal representation. The trial court closely questioned defendant to determine the basis for his concern. The trial court indicated it could not accept the plea bargain if defendant had not received adequate legal counsel. After taking a short break, defendant stated that he had received adequate counsel and wanted to plead guilty, explaining that the concerns he had expressed previously reflected his unhappiness with the legal predicament facing him.

Defendant apparently agreed to the plea bargain because he perceived the evidence against him to be overwhelming. Defendant stated:

[I]t's just that, you know, I don't know. I look at my case. I got a stack of evidence against me this high. So to say I have even a near win, you know what I mean, or almost would be wrong. So it's like, you know, the deal's good. You know what I mean?

. . . .

It's not like I'm—I mean I'm weighing out a lot, you know what I mean? If I take it to trial—30 years at least there's a little bit of light at the end of the tunnel versus 60 years or death row. There's no light there, you know what I mean?

In January 1985, the trial court entered a judgment of conviction and sentenced defendant in accordance with the plea agreement to forty years imprisonment with thirty years of parole ineligibility on the murder charge. The court also sentenced defendant to a concurrent ten-year term of imprisonment on the theft charge.

Defendant appealed his convictions for felony murder and theft, arguing that his plea was involuntarily entered due to ineffective assistance of counsel. He asserted that he entered his guilty plea because defense counsel had failed to "sufficiently explain the probabilities of his receiving other sentences" besides death and, as a result, did not understand the consequences of his plea. Defendant did not contend on direct appeal that he had been misinformed about his eligibility for the death sentence. The Appellate Division affirmed defendant's conviction and sentence for felony murder. The panel stated:

These were open and shut cases minimally showing a felony murder and a second theft. Since there was substantial evidence of a prior agreement between defen-

dant and the actual murderer to kill the occupant of the house if she proved to be at home, defendant faced the real possibility of the death penalty or at least a maximum term in excess of the 40 years given here. The minimum term was not subject to negotiation since it was mandated by *N.J.S.A.* 2C:11–3b.

Defendant also asserted that his sentence for second-degree theft was illegal because the evidence supported only third-degree theft. The State conceded that point. The Appellate Division vacated defendant's sentence on second-degree theft and remanded for resentencing. Thereafter, this Court denied defendant's petition for certification. 107 *N.J.* 57, 526 *A.*2d 144 (1986).

In March 1987, defendant filed *pro se* a petition for post-conviction relief alleging that his guilty plea to felony murder was not knowing and voluntary. He also alleged ineffective assistance of counsel. The papers defendant filed erroneously sought relief only in the form of a reduction of sentence. The trial court denied the petition, finding that it failed to meet the requirements for reduction of sentence under *Rule* 3:21–10(a), (b) and (c) (stating procedural requirements for filing motion to reduce sentence, including sixty-day filing period from date of judgment of conviction). The court also found that the *pro se* petition failed to meet the requirements for PCR under *Rule* 3:22–1, –2 and –3 (describing availability of PCR, appropriate grounds for PCR and exclusiveness of PCR remedy). Without hearing oral argument, the trial court denied the motion based on the *pro se* papers.

In September 1987, appointed counsel filed a Motion for Leave to Appeal the trial court's denial of defendant's PCR petition. In July 1988, appointed counsel realized that she had filed a motion to appeal the denial of a PCR petition although the relief sought by defendant's prior motion was only a reduction in his prison sentence. According to counsel's subsequent certification, she then wrote to defendant to inform him that his motion to reduce his sentence was two years out of time and that the issue raised in his *pro se* brief previously had been adjudicated on direct appeal. She asked defendant to inform her of any other issues she could argue on appeal and informed defendant that if she did not hear from him she would have to move to be relieved as counsel.

Counsel received a scheduling order from the Appellate Division requiring the filing of defendant's appellate brief within nine days. According to counsel, she again wrote to defendant but did not hear from him. She then informed him that if she did not file a brief his appeal would be dismissed, and that if she did not hear from him immediately she would assume that he agreed that his appeal should be dismissed. After a month, counsel still had not heard from defendant. Counsel asked to be relieved as defendant's counsel in September 1988, and subsequently discontinued her representation of defendant. In August 1989, the Appellate Division dismissed the appeal for failure to file a timely brief.

In July 1991, defendant filed *pro se* a motion for permission to file a second PCR petition *nunc pro tunc*. Defendant's supporting affidavit contradicted the facts as stated by appointed counsel, alleging that he never received letters from his appointed counsel. He contended that the prison mail logs revealed that he did not receive either of the letters described by counsel. Defendant asserted that he had excusable grounds for failing to file a PCR petition in a timely manner. The Law Division granted his motion.

In March 1992, defendant, represented by assigned counsel, filed a second PCR petition. Defense counsel contended for the first time that defendant received ineffective assistance of counsel at the plea hearing because he was misadvised concerning his death-eligibility. The PCR trial court denied defendant's petition based on *Rule* 3:22–5, finding that defendant had previously raised that claim before the Appellate Division on direct appeal and that the issue therefore was procedurally barred. The PCR trial court also found that the PCR petition was time-barred under *Rule* 3:22–12 because it was filed more than five years after the date of the judgment of conviction.

Concerning the merits of defendant's claim, the court stated:

A construction or the interpretation of those facts could lead reasonable minds to differ as to whether he was death eligible. But, it certainly isn't error on the part of counsel to draw that inference. And, in support of that conclusion, we have the Appellate Division saying in a way that he was death eligible. So, if the Appellate

Division says or draws that conclusion, how can we in good conscience say that Mr. McQuaid's lawyer was ineffective in arriving at the same conclusion[?]

The Appellate Division affirmed the PCR trial court's denial of post-conviction relief in an unreported opinion, finding that defendant's claim was time-barred under *Rule* 3:22–12. The panel nevertheless considered defendant's ineffective-assistance-of-counsel argument. Defendant argued that he was not death eligible because he did not kill the victim by "his own conduct." The panel found defendant's argument flawed because it relied on case law decided subsequent to defendant's plea. The Appellate Division concluded that defendant's counsel was not ineffective.

In May 1995, this Court granted defendant's petition for certification and summarily remanded the matter to the Appellate Division for reconsideration. 141 *N.J.* 92, 660 *A.*2d 1192 (1995). In its Order, the Court noted that the Appellate Division erroneously assumed that death-eligibility under the "own conduct" requirement of 2C:11–3c was not established until the Court decided *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988).

On remand, the Appellate Division reaffirmed its prior decision affirming the trial court's denial of defendant's PCR petition. In an unreported opinion, the panel explained that its previous "denial ... was not premised solely upon whether defendant was death-eligible under the 'own conduct' requirement of *N.J.S.A.* 2C:11–3c." The panel also held that defendant's PCR petition was barred under *Rule* 3:22–5. We granted defendant's petition for certification. 143 *N.J.* 328, 670 *A.*2d 1069 (1996).

## II

### A

### Death Eligibility

Under New Jersey's Capital Punishment Act (Act) at the time of the murder there were two classes of murderers eligible for the death penalty—those who committed murder "by [their] own conduct" and those who "procured the commission of the offense

by payment or promise of payment, of anything of pecuniary value." *L.* 1982, *c.* 111, § 1 (codified as amended at *N.J.S.A.* 2C:11–3c); *Gerald, supra,* 113 *N.J.* at 100, 549 *A.*2d 792; *State v. Ramseur,* 106 *N.J.* 123, 193, 524 *A.*2d 188 (1987).[1] In pertinent part, the Act as adopted in 1982 provided:

a. . . . [C]riminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death; or

(3) It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping or criminal escape, and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants

. . . .

c. Any person convicted under subsection a.(1) or (2) who committed the homicidal act by *his own conduct* or *who as an accomplice procured the commission of the offense by payment or promise of payment,* of anything of pecuniary value shall be sentenced as provided hereafter:

. . . .

(1) The court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death . . . .

[*L.* 1982, *c.* 111, § 1 (codified as amended at *N.J.S.A.* 2C:11–3c (emphasis added)).]

Under the own-conduct provision, a defendant must "actively and directly participate[ ] in the homicidal act, i.e., in the infliction of the injuries from which the victim died." *Gerald, supra,* 113 *N.J.* at 97, 549 *A.*2d 792 (emphasis omitted). To satisfy the own-conduct requirement, "the State [must] prove beyond a reasonable doubt that defendant's conduct was the direct and immediate cause of death." *State v. Brown,* 138 *N.J.* 481, 510, 651

---

[1] *N.J.S.A.* 2C:11–3c has since been amended to also make death-eligible a person convicted under subsection a(1) or (2) "who, as a leader of a narcotics trafficking network as defined in *N.J.S.A.* 2C:35–3 and in furtherance of a conspiracy enumerated in *N.J.S.A.* 2C:35–3, commanded or by threat or promise solicited the commission of the offense." ( *L.* 1993, *c.* 27, § 1 codified at *N.J.S.A.* 2C:11–3c).

A.2d 19 (1994) (quoting *State v. Moore,* 113 *N.J.* 239, 299, 550 A.2d 117 (1988) (emphasis omitted)).

We noted in *Gerald, supra,* that "[f]or purposes of determining an actor's guilt, both the Code and the statutory and common law that preceded it abolished the distinction between principal and accomplice." 113 *N.J.* at 93, 549 A.2d 792. However, "in adopting the 'own conduct' requirement, the legislature reinstated [the distinction] for purposes of capital punishment." *Id.* at 96, 549 A.2d 792. An accomplice may be convicted of murder under *N.J.S.A.* 2C:11–3, but unless his immediate conduct directly contributed to the victim's demise, or he hired someone else to murder the victim, he is not death-eligible. "While the imputation of liability for the conduct of another suffices for a murder conviction, the defendant's 'own conduct' in the commission of the murder is a prerequisite to imposition of the death penalty." *Ibid.; see also Moore, supra,* 113 *N.J.* at 302–03, 550 A.2d 117 (holding defendant not death-eligible under the own-conduct provision because, although she had tortured victim for number of years, defendant was not present when accomplice delivered fatal injuries to victim); *cf. State v. McDougald,* 120 *N.J.* 523, 560–62, 577 A.2d 419 (1990) (finding sufficient evidence existed to support defendant's conviction of murder by his own conduct, because both defendant and accomplice directly participated in killings by stabbing, cutting and striking victims until they died).

In *Gerald, supra,* we analyzed the legislative history of the death penalty statute with regard to the own-conduct requirement, concluding:

The legislative history of the Act makes it clear ... that in enacting *N.J.S.A.* 2C:11–3(c), the Legislature intended to distinguish, for purposes of punishment only, a murderer who actually killed—the "triggerman"—from one whose conviction rests on a theory of vicarious liability under *N.J.S.A.* 2C:2–6. An accomplice who neither takes part in the infliction of the fatal wounds nor hires another to commit the murder may properly be convicted of murder but may not be sentenced to death for his or her conduct. For this limited purpose the legislature has chosen to resurrect the distinction between a principal and an accomplice.

[113 *N.J.* at 93, 549 A.2d 792.]

In *Moore, supra,* we stated:

> We were persuaded [in *Gerald*] that it was the Legislature's intent to preclude death-eligibility where a defendant's murder conviction was based on a felony murder charge or a theory of accomplice liability, unless, as *N.J.S.A.* 2C:11–3 expressly provides, defendant hired another to commit the murder. Other than that very narrow "murder for hire" exception, only the principal, *i.e.,* "the triggerman," shall be death-eligible.
>
> [113 *N.J.* at 300, 550 *A.*2d 117.]

The murder-for-hire exception to the own-conduct requirement is narrowly limited to those who hire others to murder on their behalf. The official legislative history and legislative statements serve as valuable interpretive aid in determining the Legislature's intent. *See State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 69, 393 *A.*2d 233 (1978); 2A *Sutherland Statutory Construction* § 48 (Singer ed., 5th ed., 1992); *see also Gerald, supra,* 113 *N.J.* at 93–97, 549 *A.*2d 792 (using legislative history to interpret scope of own-conduct provision in Act). The Act's legislative history indicates the Legislature's intent to restrict the scope of the murder-for-hire provision of the death penalty statute to an accomplice who kills a victim by inducing another, with payment or the promise of pecuniary gain, to commit the murder:

> Under the provisions of Senate Bill No. 112, as clarified by amendments adopted by the committee, only a person who actually commits an intentional murder, the perpetrator, and *a person convicted as an accomplice who hired the perpetrator, the procurer,* would stand in jeopardy of the death penalty. Persons convicted under the felony-murder doctrine and persons convicted as accomplices other than as procurers would not be eligible for capital punishment.
>
> [Senate Judiciary Committee, *Statement to Senate Bill No. 112,* at 1 (Mar. 1, 1982) (emphasis added).]

A Statement clarifying amendments to the bill reaffirmed the Legislature's intent:

> These amendments clarify that any person whose conduct directly caused an intentional murder and *any person who procured an intentional murder through pecuniary inducements would be subject to the death penalty.* These amendments also clarify those murderers who are either not eligible for the death penalty or those eligible on whom the death is not imposed shall be sentenced to either 30 years imprisonment with no eligibility for parole or to a term of years between 30 years and life imprisonment with a 30 year period of parole ineligibility.
>
> [*Statement to Senate Floor Amendments to Bill No. 112,* at 2 (Mar. 29, 1982) (emphasis added).]

A later legislative Statement explains:

The purpose of Senate Bill No. 112 is to reinstate capital punishment in New Jersey. Under the provision of Senate Bill No. 112, ... only a person who actually commits an intentional murder, *and a person convicted as an accomplice who hired the murderer*, would stand in jeopardy of the death penalty. Persons convicted under the felony-murder doctrine and persons convicted as accomplices other than as procedures [sic] would not be subject to capital punishment. [Assembly Judiciary, Law, Public Safety and Defense Committee, *Statement to Senate Bill No. 112*, at 1 (May 20, 1982) (emphasis added).]

■ Significantly, those legislative Statements distinguish between general accomplices and accomplices who hire a perpetrator to commit the murder. The death-penalty statute provides that the death penalty is to be applied only to accomplices who hire others to commit the murder. Moreover, as the Legislative Statements make clear, a death-eligible accomplice must do more than solicit or merely urge another to commit murder. Such an accomplice must actually hire the perpetrator. The common meaning of "hire" is to engage the personal services of another in return for a stipulated payment. *See Black's Law Dictionary* 502 (6th ed.1991).

The Legislature's intent to limit the application of the death penalty to a narrow group of accomplices is further illustrated by the following colloquy over an earlier draft of the bill:

Senator Russo: Under this bill, there are only two people who can get the death penalty, one is the fellow who wields the instrument of death and the other is the fellow who hires the one to commit the crime.

Mr. Stier: I don't think so. I think it is broader than that.

. . . .

Senator Russo: ... [I]f I hire you to commit an assassination, that is clear; and, it is clear that it is covered under [the statute]. But, I think what your suggestion is, if I, without hiring you, said "Ed, I don't like Fred," and I solicit you to get your gun and go shoot him and you do, that I would be under—

Mr. Stier: That is right.

Senator Russo: All right.... That is not the intent.

Senator Dorsey: What about in the murder for hire where you have a whole team, but only one wields the weapon. What about the rest of the team, the driver, the stake-out?

Senator Russo: No, no, they are not covered. Well, they are going to only get life.

Senator Dorsey: Yes, but their participation made the crime possible.

Senator Russo: That is true. Let's talk about that for a moment.... My purpose as sponsor is that this bill apply only to two categories, not that it couldn't

perhaps be justified to more, but I want to limit it to two categories and always have. One is the person who wielded the instrument of death and two is the person who hired someone, the contract case. I don't make the argument by that that others should not be subjected to the death penalty. I just don't want to go that far at this time.... I think we should take only this first step—the actual person who wields the instrument of death and the person who hires one, not solicits. So, we are going to have to clean that language up if you go along with me. We are interested in the person hired for a contract killing.

Senator Dorsey: I only speak in terms of the accomplice who pays to have it done.

Senator Russo: Exactly.

[*Capital Punishment Act: Hearings on Senate Bill No. 112 Before the Senate Judiciary Committee,* at 16–17 (Feb. 26, 1982).]

■ The legislative history of the Act thus clearly demonstrates that the Legislature intended to distinguish, for purposes of punishment, defendants who actually killed and defendants who hired others to kill from accomplices otherwise involved in the murder. Pursuant to the 1982 death penalty statute, a defendant must have directly caused the death-producing injuries or have hired another to do so to be death-eligible.

## B

### PCR Procedural Bars

Pursuant to *Rule* 3:22–2, post-conviction relief is available to a defendant on four grounds: (a) substantial denial in the conviction proceedings of a defendant's rights under the federal constitution, state constitution or state law; (b) lack of jurisdiction by the court imposing sentence; (c) imposition of an improper sentence; and (d) any other habeas corpus, common-law or statutory grounds for a collateral attack. *R.* 3:22–2.

■ Post-conviction relief is a safeguard that ensures that a defendant was not unjustly convicted. It is the state analogue to the federal writ of habeas corpus. *State v. Preciose,* 129 *N.J.* 451, 459, 609 *A.*2d 1280 (1992). PCR provides a defendant with a means to challenge the legality of a sentence or final judgment of conviction which could not have been raised on direct appeal. *See In re Santiago,* 104 *N.J.Super.* 110, 115, 248 *A.*2d 701 (Law

Div.1968), *aff'd o.b.*, 107 *N.J.Super.* 243, 258 *A.*2d 31 (App.Div. 1969). It is not used to challenge the sufficiency of evidence used to convict a defendant. *State v. Morales*, 120 *N.J.Super.* 197, 200, 293 *A.*2d 672 (App.Div.), *certif. denied*, 62 *N.J.* 77, 299 *A.*2d 75 (1972).

■ A defendant ordinarily must pursue relief by direct appeal, *see R.* 3:22–3, and may not use post-conviction relief to assert a new claim that could have been raised on direct appeal. *See R.* 3:22–4. Additionally, a defendant may not use a petition for post-conviction relief as an opportunity to relitigate a claim already decided on the merits. *See R.* 3:22–5. A claim for post-conviction relief must be established by a preponderance of the credible evidence. *Preciose, supra*, 129 *N.J.* at 459, 609 *A.*2d 1280; *State v. Mitchell*, 126 *N.J.* 565, 579, 601 *A.*2d 198 (1992).

Procedural bars exist in order to promote finality in judicial proceedings. *Rule* 3:22–4 imposes a procedural bar to prevent claims from being raised on PCR that reasonably could have been raised on direct appeal. However, *Rule* 3:22–4 also delineates circumstances where that bar does not apply.

> Any ground for relief not raised in a prior proceeding ... is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.
>
> [*R.* 3:22–4.]

We explained the scope of the *Rule* 3:22–4 procedural bar in *Preciose, supra:*

> [W]e generally have declined to read the exceptions to *Rule* 3:22–4 narrowly ... [w]e held that "an error [that] denies fundamental fairness in a constitutional sense and hence denies due process of law" can be asserted in post-conviction proceedings as long as it was not litigated previously. Although we have construed the "fundamental fairness" exception to apply only when a petitioner's guilt or innocence is involved, we have generously interpreted *Rule* 3:22–4(a) to permit the assertion of claims that could not reasonably have been raised in earlier proceedings.
>
> [129 *N.J.* at 476–77 (citations omitted).]

Ineffective assistance of counsel claims may often fall within *Rule* 3:22–4(c), because those claims are grounded in the Sixth Amendment of the United States Constitution and the New Jersey Constitution. *See Preciose, supra,* 129 *N.J.* at 460, 609 *A.*2d 1280; *State v. Sloan,* 226 *N.J.Super.* 605, 612, 545 *A.*2d 230 (App.Div.), *certif. denied,* 113 *N.J.* 647, 552 *A.*2d 171 (1988). This Court has also noted the appropriateness of asserting ineffective assistance of counsel claims on PCR because such claims often cannot reasonably be raised on direct appeal or in prior proceedings. *See State v. Martini,* 144 *N.J.* 603, 609, 677 *A.*2d 1106 (1996) (*Martini III* ); *Preciose, supra,* 129 *N.J.* at 460, 609 *A.*2d 1280; *see also State v. Sparano,* 249 *N.J.Super.* 411, 419, 592 *A.*2d 608 (App.Div. 1991) (same).

 However, when the issue of ineffective assistance of counsel has already been raised on direct appeal, it may be procedurally barred on PCR by *Rule* 3:22–5. That rule provides:

A prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings.

[*R.* 3:22–5.]

"[A] prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction review." *Preciose, supra,* 129 *N.J.* at 476, 609 *A.*2d 1280. However, claims that differ from those asserted below will be heard on PCR. "Preclusion of consideration of an argument presented in post-conviction relief proceedings should be effected only if the issue is identical or substantially equivalent" to that issue previously adjudicated on its merits. *Picard v. Connor,* 404 *U.S.* 270, 276–77, 92 *S.Ct.* 509, 512–13, 30 *L.Ed.*2d 438, 444 (1971); *State v. Bontempo,* 170 *N.J.Super.* 220, 234, 406 *A.*2d 203 (Law Div.1979). If the same claim is adjudicated on the merits on direct appeal a court should deny PCR on that issue, thereby encouraging petitioners to raise all meritorious issues on direct appeal.

■ A final procedural bar to PCR review is set forth in *Rule* 3:22–12, which establishes a five-year time limit for petitioning for PCR:

> A petition to correct an illegal sentence may be filed at any time. No other petition shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges facts showing that the delay beyond said time was due to defendant's excusable neglect.
>
> [*R.* 3:22–12.]

In *Mitchell, supra,* we emphasized the important policy underlying the requirement that PCR petitions be timely filed, explaining:

> There are good reasons for [*Rule* 3:22–12]. As time passes after conviction, the difficulties associated with a fair and accurate reassessment of the critical events multiply. Achieving "justice" years after the fact may be more an illusory temptation than a plausibly attainable goal when memories have dimmed, witnesses have died or disappeared, and evidence is lost or unattainable.... Moreover, the Rule serves to respect the need for achieving finality of judgments and to allay the uncertainty associated with an unlimited possibility of relitigation. The Rule therefore strongly encourages those believing they have grounds for post-conviction relief to bring their claims swiftly, and discourages them from sitting on their rights until it is too late for a court to render justice.
>
> [126 *N.J.* at 575–76, 601 *A.*2d 198.]

Notwithstanding *Rule* 3:22–12, however, a court may relax the time bar if adherence to it would result in an injustice. *See Mitchell, supra,* 126 *N.J.* at 576, 601 *A.*2d 198. When determining whether to relax the time bar, we stated in *Mitchell* that a court should consider "the extent and cause of the delay, the prejudice to the State, and the importance of the petitioner's claim in determining whether there has been an 'injustice' sufficient to relax the time limits." *Id.* at 580, 601 *A.*2d 198.

## C

### Manifest Injustice to Defendant

■ A plea-bargain provides "mutuality of advantage" to both the defendant and the State. *See Bordenkircher v. Hayes,* 434 *U.S.* 357, 363, 98 *S.Ct.* 663, 668, 54 *L.Ed.*2d 604, 611 (1978); *Brady v. United States,* 397 *U.S.* 742, 752, 90 *S.Ct.* 1463, 1471, 25 *L.Ed.*2d 747, 758 (1970); *State v. Taylor,* 80 *N.J.* 353, 361, 403 *A.*2d 889 (1979); *State v. Corbitt,* 74 *N.J.* 379, 394, 378 *A.*2d 235

(1977), *aff'd*, 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978). The defendant benefits by reducing his penal consequences and avoiding the public humiliation of a trial; the State benefits by assuring that a guilty defendant is punished and by protecting valuable judicial and prosecutorial resources. *See Brady, supra,* 397 *U.S.* at 752, 90 *S.Ct.* at 1471, 25 *L.Ed.*2d at 758; *Taylor, supra,* 80 *N.J.* at 361, 403 *A.*2d 889; *State v. Marzolf,* 79 *N.J.* 167, 182–83, 398 *A.*2d 849 (1979). However, plea bargains may be accepted only if the trial court is assured that a defendant enters his plea of guilty knowingly and voluntarily. *See Brady, supra,* 397 *U.S.* at 748, 90 *S.Ct.* at 1469, 25 *L.Ed.*2d at 756.

 *Rule* 3:9–2 states in pertinent part:

> The court, in its discretion, may refuse to accept a plea of guilty and shall not accept such plea without first addressing the defendant personally and determining by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea and that the plea is made voluntarily, not as the result of any threats or any promises or inducements not disclosed on the record, and *with an understanding of the nature of the charge and the consequences of the plea.*
> [*R.* 3:9–2 (emphasis added).]

As we have previously stated, *Rule* 3:9–2 requires that a defendant who pleads guilty do so voluntarily, knowingly, and intelligently. *See State v. Kiett,* 121 *N.J.* 483, 491, 582 *A.*2d 630 (1990) (holding on direct appeal that juvenile defendant entitled to vacate plea due to mistaken impression he was death-eligible); *State v. Howard,* 110 *N.J.* 113, 122, 539 *A.*2d 1203 (1988); *Taylor, supra,* 80 *N.J.* at 362, 403 *A.*2d 889; *see also Brady, supra,* 397 *U.S.* at 743–48, 90 *S.Ct.* at 1463–69, 25 *L.Ed.*2d at 753–56 (holding plea entered on death-eligible kidnapping charge, following co-defendant's guilty plea, voluntary). A defendant has "the right not to be 'misinformed ... as to a material element of a plea negotiation, which [he] has relied thereon in entering his plea.'" *Howard, supra,* 110 *N.J.* at 122, 539 *A.*2d 1203 (citing *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976)).

 If a defendant's plea is not entered knowingly and voluntarily, *Rule* 3:21–1 allows a defendant to withdraw his or her plea. *Rule* 3:21–1 provides: "A motion to withdraw a plea of

guilty ... shall be made before sentencing, *but the court may permit it to be made thereafter to correct a manifest injustice."* (emphasis added). Following sentencing, if a defendant seeks to withdraw a guilty plea the court weighs more heavily the State's interest in finality and applies a more stringent standard. *See Taylor, supra,* 80 *N.J.* at 359–60, 403 *A.2d* 889; *State v. Deutsch,* 34 *N.J.* 190, 198, 168 *A.2d* 12 (1961). The discretionary determination entails a balancing of the competing interests:

> In exercising its discretion, the court must weigh the policy considerations which favor the finality of judicial procedures against those which dictate that no man be deprived of his liberty except upon conviction after a fair trial or after the entry of a plea of guilty under circumstances showing that it was made truthfully, voluntarily and understandingly.

> [*State v. Herman,* 47 *N.J.* 73, 76–77, 219 *A.2d* 413 (1966).]

Misinformation provided to a defendant that is not material to the decision to plead guilty does not render a plea involuntary. In *Taylor, supra,* the defendant sought to withdraw his guilty plea to charges stemming from his indictment on a series of heinous crimes committed against two victims during a drug transaction, which included premeditated and felony murder, armed robbery and robbery. 80 *N.J.* at 356–58, 403 *A.2d* 889. Defendant argued on appeal that he should be permitted to withdraw his plea because he had been misinformed concerning the "potential extent of penal exposure" had he elected to stand trial on all charges. *Id.* at 358–59, 403 *A.2d* 889. Defendant maintained that he was misinformed regarding the possible merger of the armed robbery and robbery counts of the indictment. *Id.* at 359, 403 *A.2d* 889. He asserted that his plea could not be considered knowing and intelligent and should be vacated. *Ibid.*

This Court considered whether the interests of justice would be served by enforcing the plea bargain. *Id.* at 360, 403 *A.2d* 889. We acknowledged that if "there exists a reasonable likelihood of merger, a trial court should in all fairness to the defendant inform him of that contingency." *Id.* at 363, 403 *A.2d* 889. We noted, however, that "[w]hat is crucial is that the plea bargain has been fairly reached and that defendant's reasonable expectations drawn

from the terms of the bargain have been fulfilled." *Id.* at 364, 403 *A.*2d 889. The Court endorsed the approach that the decision whether to permit a defendant to withdraw his plea should "be decided on a case-by-case basis, depending upon whether the defendant can be said to have been prejudiced by the omission." *Id.* at 363–64, 403 *A.*2d 889 (citing *Bachner v. United States,* 517 *F.*2d 589, 599 (7th Cir.1975) (Stevens, J., concurring); *United States v. Woodall,* 438 *F.*2d 1317, 1329 (5th Cir.1970), *cert. denied,* 403 *U.S.* 933, 91 *S.Ct.* 2262, 29 *L.Ed.*2d 712 (1971)). We emphasized the element of doubt inherent in any plea bargain, noting that the ultimate sentence to be imposed is never a certainty. *Id.* at 364, 403 *A.*2d 889. We concluded that "[i]f a defendant does not 'correctly assess every relevant factor entering into his decision', this will not automatically render his plea involuntary or unintelligent." *Ibid.* (quoting *Brady, supra,* 397 *U.S.* at 756–57, 90 *S.Ct.* at 1473, 25 *L.Ed.*2d at 761).

In *Taylor, supra,* we concluded that the information conveyed to the defendant was not false or misleading and did not constitute a material misrepresentation sufficient to allow the defendant to withdraw his plea. We determined that the potential sentence was not "so overstated as to render the plea unfair." *Id.* at 364, 403 *A.*2d 889. We noted that the prosecutor relinquished the possibility of pursuing more extensive sentences and recommended that the two possible consecutive life sentences for murder and the sentence maximums relating to the other charges be reduced to two consecutive twenty to twenty-five year terms for the murders, with a concurrent term on a weapons charge. Further, the prosecutor agreed to dismiss all other charges. The defendant clearly benefitted from the plea bargain. *Id.* at 366, 403 *A.*2d 889. We found no material misrepresentation in the failure to indicate the possibility of the merger for the armed robbery and robbery charges in view of the defendant's exposure to life sentences if convicted of either or both of the murder charges. *Id.* at 366–67, 403 *A.*2d 889.

If misinformation does materially influence a defendant's decision to plead guilty, he will be allowed to withdraw the plea if as a result he suffers prejudice. *See Howard, supra,* 110 *N.J.* at 123, 539 *A.*2d 1203. In *State v. Kovack,* 91 *N.J.* 476; 453 *A.*2d 521 (1982), we affirmed the Appellate Division's ruling that the defendant's reasonable expectations in the plea bargain were not fulfilled because the defendant was not informed of the period of parole ineligibility to which he might be sentenced. *Id.* at 482–84, 453 *A.*2d 521. Defendant had pled guilty to aggravated sexual assault; in exchange the State dismissed other counts of sexual assault and endangering the welfare of a child. *Id.* at 480, 453 *A.*2d 521. The court sentenced defendant to a custodial term of eight years and imposed a minimum period of four years parole ineligibility. *Ibid.* The Appellate Division determined that defendant had not contemplated a sentence requiring parole ineligibility when he pled guilty. *Id.* at 481, 453 *A.*2d 521. We concluded that a trial court must inform a defendant of any loss of parole opportunities that may be a component of a sentence imposed and that it is a court's responsibility to ensure, through questioning, that a defendant understands that a period of parole ineligibility can be made part of the sentence. *Id.* at 483–84, 453 *A.*2d 521.

This Court has considered the impact on a defendant of misinformation concerning his or her potential death-eligibility. In *Kiett, supra,* we held that the "potential imposition of a death sentence, for the crimes for which defendant is charged are clearly penal consequences about which a defendant must be fully informed." 121 *N.J.* at 489, 582 *A.*2d 630. We determined that if a defendant is misinformed that he or she is death-eligible, and the misinformation is material to the defendant's decision to enter a guilty plea, then the defendant must be allowed to withdraw his or her plea because it is not entered with a full understanding of the penal consequences. *Ibid.*

In *Howard, supra,* we considered the prejudice to a defendant seeking to vacate his guilty plea to second-degree sexual assault due to the failure to inform him of a potential sentence to Avenel

and its parole consequences. 110 *N.J.* at 118, 539 *A.*2d 1203. In exchange for his guilty plea, the State dismissed charges of first-degree sexual assault, endangering the welfare of a child and hindering apprehension. *Ibid.* The State agreed to recommend a maximum sentence of seven years without a period of parole ineligibility. *Ibid.* The trial court informed the defendant that the penalty for second-degree sexual assault included the potential for a period of parole ineligibility. *Id.* at 119, 539 *A.*2d 1203. After ascertaining that the defendant understood the possibility of parole ineligibility, the court found defendant's plea knowing and voluntary. *Ibid.* Immediately after accepting the plea, the court mentioned the possibility of a sentence to Avenel, the Adult Diagnostic and Treatment Center. The court directed an Avenel staff psychologist to evaluate defendant. The psychologist diagnosed defendant as a repetitive sex offender. The court accepted that determination and sentenced defendant to seven years at Avenel. *Ibid.* Parole eligibility for prisoners at Avenel is based solely on the prisoner's therapeutic progress. *Id.* at 119–20, 539 *A.*2d 1203. We found the omission of that information regarding a possible sentence to Avenel to have been material to defendant's decision to plead guilty. *Id.* at 125, 539 *A.*2d 1203. We ruled that trial courts must thereafter inform a sex offender of the possibility of serving his sentence at Avenel and the potential effect such a sentence could have on his parole ineligibility. *Ibid.* We allowed the defendant to withdraw his plea. *Ibid.* We denied, however, the defendant's request that he be resentenced to an ordinary prison term, because of his need for rehabilitation. *Id.* at 133, 539 *A.*2d 1203.

When confronted with a post-sentencing application to vacate a guilty plea, a court must determine if prejudice was suffered by a defendant who is misinformed about the underlying law or potential penal consequences related to his plea, and who materially relied on that misinformation in his decision to plead guilty. After weighing the defendant's interest in a plea vacation and retrial against the competing interest of the State in the

finality of the judgment of conviction, a court should allow the defendant to withdraw his plea if the prejudice suffered by the defendant would result in a manifest injustice. *R.* 3:21–1; *Howard, supra,* 110 *N.J.* at 123–24, 539 *A.*2d 1203.

## III

### A

In his petition for PCR, defendant argues that he was improperly advised that he was death-eligible because he did not commit the homicidal act by his "own conduct." See *N.J.S.A.* 2C:11–3c. The record, which includes defendant's December 17, 1982, confession, his plea hearing statement and the statements by Cumens and Woodward, establishes that Woodward, not defendant, pulled the trigger. Accordingly, defendant was not death-eligible under the own-conduct requirement. *See Brown, supra,* 138 *N.J.* at 510, 651 *A.*2d 19; *Gerald, supra,* 113 *N.J.* at 97, 549 *A.*2d 792; *Moore, supra,* 113 *N.J.* at 302–03, 550 *A.*2d 117.

The State notes that this was one of the first cases prosecuted under the death-penalty statute. Defendant was the first person indicted for capital murder in Camden County following the reinstatement of the death penalty. The State argued in its Appellate Division brief that trial counsel could not reasonably have been expected to have known of the narrow interpretation of "own conduct" in the holdings of *Gerald* and *Moore* because those cases were decided subsequent to the plea hearing. In our Order of May 10, 1995, remanding to the Appellate Division for reconsideration of defendant's request for PCR, we specifically rejected that reasoning. *See* 141 *N.J.* 92, 660 *A.*2d 1192 (1995) (recording summary remand). Our conclusion that defendant was not death-eligible is based primarily on the language of the death penalty statute and its legislative history. See discussion *supra* at 477–82, 688 *A.*2d at 591–93. That information was available to trial counsel at the time of the plea hearing.

The State's primary argument is that defendant was death-eligible pursuant to the "murder for hire" category under *N.J.S.A.* 2C:11–3c, relying on *State v. Marshall,* 123 *N.J.* 1, 137, 586 *A.*2d 85 (1991) (*Marshall I* ); *Gerald, supra,* 113 *N.J.* at 92, 549 *A.*2d 792; and *Ramseur, supra,* 106 *N.J.* at 188, 524 *A.*2d 188. The State alleges that defendant's death-eligibility arose from his solicitation of Woodward to murder Watson pursuant to an agreement to share the proceeds of items stolen from Watson's home. However, the record and the statute's legislative history indicate that defendant was not death-eligible under that theory.

The evidence was insufficient to sustain the charge of "murder for hire." First, there was no firm agreement between Woodward and defendant to kill Watson if she was found in the house. Although Woodward and defendant admitted having had at least one previous discussion about whether they would kill anyone in the course of a burglary, any agreement between the two men was extremely vague. The evidence does not indicate that they agreed on who would commit the murder or on how the murder would be committed.

Furthermore, there was no evidence that defendant and Woodward agreed that, in exchange for killing Watson, Woodward would receive a share of the proceeds from the burglary. Neither defendant nor Woodward stated that defendant had induced Woodward to kill Watson with payment or promise of payment. Although Woodward and Cumens both stated that defendant found the gun, gave the gun to Woodward, and then urged Woodward to kill Watson, there is no evidence that defendant threatened to withhold Woodward's share of the proceeds if Woodward refused to kill Watson. Most significantly, there is no evidence that defendant told Woodward, or that Woodward believed, that if he refused to shoot Watson he would not receive his share of the proceeds. Although Woodward may have been urged to kill Watson, he was not induced by payment or promise of payment. The language and legislative history of the death penalty statute indicate that an accomplice who merely urges the

murderer to commit the homicide is not death-eligible; the accomplice must "hire" the perpetrator to commit murder to be death-eligible. On this record, there is simply no evidence that defendant hired Woodward to kill Watson. We therefore find that defendant was misinformed that he was death-eligible.

B

In an unreported opinion, the Appellate Division held that defendant's second PCR petition was barred under *Rule* 3:22–5. It found that the Appellate Division panel on direct appeal had already adjudicated on its merits the claim defendant asserted in his second PCR petition, namely that he had been denied his right to effective assistance of counsel.

On direct appeal, the Appellate Division characterized defense counsel's argument as follows: that defendant's guilty plea was not voluntarily entered due to ineffective assistance of counsel in that counsel did not sufficiently explain the probabilities of his receiving other sentences. Counsel argued that defendant did not understand the consequences of his plea, but did not contend that defendant was misinformed about his death-eligibility. The State argued that defendant was death-eligible and therefore no ineffective assistance of counsel had occurred. The Appellate Division found that "the defendant faced the real possibility of the death penalty" and ruled that no ineffective assistance of counsel had occurred.

In rejecting defendant's second PCR petition, the Appellate Division panel noted that the heading of Point I in defendant's direct appeal brief stated "Defendant's Plea Was Not Voluntarily Entered Due to Ineffective Assistance of Counsel." Although it found the petition to be procedurally barred, it also determined that defendant's claim of ineffective assistance of counsel was without merit.

The State seeks affirmance of the Appellate Division's finding that defendant's present allegation of ineffective assistance of counsel is barred under *Rule* 3:22–5 because the 1986 Appellate

Division opinion expressly adjudicated that claim on its merits. The State emphasizes that it raised in its direct appeal brief the issue of death-eligibility, focusing on defendant's liability based on the murder-for-hire provision. The State asserts that defendant's PCR counsel conceded that the Appellate Division on direct appeal previously had adjudicated defendant's claim of ineffective assistance of counsel.

Defendant, however, contends that *Rule* 3:22–5 does not bar his PCR claim of ineffective assistance of counsel because his current claim differs from the one he made on direct appeal. He asserts that the contention he seeks to advance through PCR proceedings—that he suffered ineffective assistance of counsel because his counsel failed to inform him that he was not death-eligible—was not raised or previously adjudicated on direct appeal. He contends that on direct appeal his counsel failed to make the argument that defendant was not death-eligible.

 The failure of defendant's counsel to raise that claim on direct appeal does not preclude this Court from considering the argument on its merits. That defendant did not raise that contention on direct appeal or in his first PCR application undoubtedly is attributable to counsels' failure to recognize the potential significance of the question. In another context we have observed that defendants "should not pay the exacting price for state procedural forfeitures that result from the ignorance or inadvertence of their counsel—regardless of whether counsel's error violates constitutional standards." *Preciose, supra,* 129 *N.J.* at 477, 609 *A.*2d 1280. Although defendant filed his second PCR petition in March 1992, he attempted to file his first one within the time limits of *Rule* 3:22–12. His first PCR petition, filed *pro se* in 1987, failed to articulate the claim now asserted and was decided solely on the papers by the PCR trial court without benefit of counsel. Accordingly, defendant has not yet had the opportunity to advance the argument that he was denied effective assistance of counsel because counsel misinformed him about his death-eligibility and that misinformation was material to his decision to plead guilty.

Notwithstanding the arguments advanced by the State for imposing a procedural bar to defendant's second PCR petition, we elect to address the petition on the merits. We appreciate fully the State's contention that defendant's delay in advancing the argument that defendant was misinformed about his death-eligibility could materially prejudice the State in the event of a retrial because of the substantial lapse of time. Nevertheless, we are unable on this record to conclude that defendant should be penalized because trial counsel, appellate counsel and PCR counsel failed to raise this issue at an earlier stage. If defendant did not enter a knowing plea and as a result suffered manifest injustice, then the procedural bars may be waived. As noted previously, "this Court has repeatedly emphasized that procedural rules 'are not an end unto themselves, but a means of serving the ends of justice.'" *Preciose, supra,* 129 *N.J.* at 474, 609 *A.*2d 1280 (quoting *Viviano v. CBS,* 101 *N.J.* 538, 550–51, 503 *A.*2d 296 (1986) and citing *Mitchell, supra,* 126 *N.J.* at 578–79, 601 *A.*2d 198). Under the circumstances, we need not determine whether one or more of the procedural bars should be imposed because we have concluded that on the merits defendant is unable to demonstrate prejudice sufficient to grant PCR relief.

C

Defendant contends that his guilty plea was not knowing and voluntary, due to misinformation provided by trial counsel regarding his death-eligibility. As noted, defendant was not death-eligible at the time he entered his plea. *See supra* at 489–91, 688 *A.*2d at 597–98. Defendant, defense counsel, the prosecutor, the trial court and the direct-appeal Appellate Division panel all incorrectly believed that defendant was death-eligible.

In order to show that his guilty plea was not knowing and voluntary, defendant also must demonstrate that his mistaken belief about the penal consequences to which he was exposed was a material factor in his decision to plead guilty. *Kiett, supra,* 121 *N.J.* at 489, 582 *A.*2d 630. Additionally, defendant must show that

he was prejudiced by enforcement of the plea agreement. *Howard, supra,* 110 *N.J.* at 123, 539 *A.*2d 1203. "[T]he plea will not be vacated if knowledge of the consequences would not have made any difference in the defendant's decision to plead." *Ibid.* To withdraw his plea, defendant must show that a manifest injustice has occurred. *R.* 3:21–1.

▮▮▮▮ Defendant fails to establish that permitting his plea of guilty to felony murder and theft to stand results in a manifest injustice. Defendant was indicted on a total of fifteen charges relating to the Watson burglary, and on six additional charges relating to the Haddonfield burglary. See *supra* at 472–73, 688 *A.*2d at 587–88. The most serious crime of which defendant could have been convicted is felony murder. Ample evidence existed to support defendant's conviction for felony murder, including his confession of December 17, 1982, in which he admitted that Watson was killed in the course of the robbery/burglary.

The statutory minimum sentence for felony murder is thirty years with thirty years of parole ineligibility; the maximum is a term of years between thirty years and life imprisonment with a mandatory thirty year parole ineligibility period. *N.J.S.A.* 2C:11–3b. In the plea agreement, defendant pled guilty to felony murder and received a forty-year term and the statutory minimum thirty-year term of parole ineligibility. He also pled guilty to one count of second-degree theft related to the Haddonfield indictment and received a concurrent forty-year term with five years of parole ineligibility, although that conviction was later reversed and remanded for resentencing because the evidence only supported a third-degree theft conviction. Defendant would have received at least thirty years of parole ineligibility if he was convicted after trial of felony murder or if he negotiated another plea arrangement after being correctly informed that he was not death-eligible.

Moreover, defendant was subject to a significantly greater term of imprisonment in addition to that imposed for the felony murder charge and theft charges. Pursuant to *N.J.S.A.* 2C:43–6a(2), the court could have sentenced defendant to a term of imprisonment

of from five to ten years for count eight, the burglary of the Watson house, if the robbery charge served as the predicate felony for felony murder. *See State v. Brown,* 138 *N.J.* 481, 560–61, 651 *A.*2d 19 (1994); *State v. Ortiz,* 203 *N.J.Super.* 518,. 522–23, 497 *A.*2d 552 (App.Div.), *certif. denied,* 102 *N.J.* 335, 508 *A.*2d 212 (1985). The three counts of hindering apprehension could have subjected defendant to an additional three to five years on each count. *N.J.S.A.* 2C:43–6a(3). Additionally, defendant could have received three to five years on count thirteen, possession of a knife for an unlawful purpose, plus five to ten years on count fourteen, possession of a gun for an unlawful purpose. *N.J.S.A.* 2C:39–4; *N.J.S.A.* 2C:43–6a(2), (3). Defendant could have received an additional three to five years for count fifteen, unlawful possession of a handgun. *N.J.S.A.* 2C:39–5b; *N.J.S.A.* 2C:43–6a(3). Finally, defendant was subject to an additional prison sentence on the charges related to the Haddonfield burglary. Defense counsel stated at the plea hearing, given the numerous other offenses on which defendant was indicted, that defendant's base sentence of forty years could have been increased to the equivalent of a life sentence with sixty years of parole ineligibility depending on the extent to which the trial court imposed consecutive sentences. In addition, given defendant's prior record, on request of the prosecutor after trial the court could have sentenced him as a persistent offender, pursuant to *N.J.S.A.* 2C:44–3. *See State v. Dunbar,* 108 *N.J.* 80, 87–91, 527 *A.*2d 1346 (1987).

Consequently, defendant's sentence pursuant to the plea agreement was undoubtedly substantially more lenient than the sentence he would have received if convicted after trial. Defendant recognized as much when he stated, "If I take it to trial—30 years at least there's a little bit of light at the end of the tunnel versus 60 years or death row." Defendant further stated, "the deal's good."

We must weigh the policy consideration in favor of finality of judicial proceedings against the alleged prejudice to the defendant. *See Mitchell, supra,* 126 *N.J.* at 584, 601 *A.*2d 198; *Her-*

*man, supra,* 47 *N.J.* at 76–77, 219 *A.*2d 413. If we were to permit defendant to withdraw his plea and retry the case, there would be significant prejudice to the State. That prejudice is substantial because nearly fourteen years have passed since defendant's plea hearing. "[T]he longer the time-span since the original trial, the more difficult a retrial becomes." *Mitchell, supra,* 126 *N.J.* at 580, 601 *A.*2d 198. Numerous problems are caused by that passage of time such as potential witness and document unavailability. *See ibid.* In this case, the burden on the State outweighs the defendant's asserted interests.

Defendant fails to demonstrate prejudice that is sufficient to allow him to withdraw his guilty plea. Defendant must show that the misinformation provided to him was material to his decision to plead guilty, that he relied on it and that he suffered prejudice to such an extent as to result in manifest injustice. *Howard, supra,* 110 *N.J.* at 123–24, 539 *A.*2d 1203.

Although the misinformation concerning death-eligibility undoubtedly contributed to defendant's decision to plead guilty to felony murder, defendant has not sustained his burden of showing that to allow his guilty plea to stand would result in a manifest injustice. Because of his sentencing exposure, the probability is overwhelming that defendant would have accepted the plea bargain without regard to his death eligibility. The plea bargain resulted in a highly beneficial sentence for defendant. Although the potential death sentence may have affected defendant's calculations, his sentencing exposure for the non-capital offenses was sufficiently severe to make the plea bargain highly attractive.

As defendant noted at his plea hearing, the evidence against him was overwhelming. He spoke for many hours with counsel regarding the potential sentences that could be imposed on him if convicted after trial. He confessed to the police five days following his apprehension at the scene of the second crime. Defendant asserted no *Miranda* violations, suggesting that his confession would probably have been admitted into evidence in the event of a trial. The two other statements by Woodward and Cumens,

together with the physical evidence, suggest that the case against defendant would have been virtually certain to result in a conviction of at least felony murder, theft, and several other charges.

When balancing the serious detriment to the State of conducting a trial after the delay of fourteen years with the fact that defendant gained substantial benefit from the plea bargain, we conclude that defendant cannot demonstrate that the death-eligibility misinformation materially and prejudicially influenced his decision to plead guilty. Accordingly, we find insufficient evidence of manifest injustice to permit defendant to vacate his plea.

## IV

We affirm the judgment of the Appellate Division denying defendant's petition for post-conviction relief.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—7.

*Opposed*—None.