**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1438-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

THERESA WILLIAMS, a/k/a
THERESA MARTIN and BIBI
KHAN,

    Defendant-Appellant.

_____

        Argued October 2, 2017 — Decided July 12, 2018

        Before Judges Ostrer and Rose.

        On appeal from Superior Court of New Jersey,
        Law Division, Bergen County, Indictment No.
        11-02-0231.

        Eric V. Kleiner argued the cause for
        appellant.

        Annmarie Cozzi, Senior Assistant Prosecutor,
        argued the cause for respondent (Gurbir S.
        Grewal, Bergen County Prosecutor, attorney;
        Catherine A. Foddai, Assistant Prosecutor, of
        counsel and on the brief).

PER CURIAM

Defendant Theresa Williams appeals from the trial court's order denying her motion to withdraw her plea. This is our third occasion to review defendant's case. Defendant entered a guilty plea on April 4, 2011 to second-degree attempted extortion; and on June 3, 2011, was sentenced in accordance with the plea agreement to a downgraded sentence of three years. The court denied her motion to withdraw her plea on October 22, 2015. We affirm.

I.

In her direct appeal, we rejected defendant's sole point that her attorney provided ineffective assistance of counsel; we concluded defendant should have first raised the claim in a petition for post-conviction relief in the trial court. State v. Williams, No. A-5505-10 (App. Div. June 20, 2013) (slip op. at 5) (Williams I). However, we sua sponte remanded for reconsideration of the sentence, because the trial court failed to justify the downgraded sentence in compliance with N.J.S.A. 2C:44-1(f)(2) and State v. Moore, 377 N.J. Super. 445, 450 (App Div. 2005). Williams I, slip op. at 6-7.

After our initial remand, the court adhered to its sentence. We thereafter affirmed the sentence, concluding the court made appropriate findings essential to justify the downgrade in accordance with N.J.S.A. 2C:44-1(f)(2). State v. Williams, No.

A-0834-13 (App. Div. Dec. 5, 2014) (slip op. at 11-12) (<u>Williams II</u>). But, we remanded for the court to consider defendant's motion to withdraw her guilty plea, which she filed on August 1, 2013, the day of the court's sentencing hearing on remand. <u>Id.</u> at 12. Although the trial court appropriately declined to hear the withdrawal motion on that day, we held the court should have considered it at a later time, after giving the State an appropriate opportunity to respond. <u>Id.</u> at 12-13. The subsequent proceedings in the trial court pertained to defendant's motion to withdraw.

In her plea allocution in 2011, defendant admitted that in December 2010, she attempted to extort "money or property" from an elderly widow by threatening to disclose a tape recording depicting the widow's late husband engaged in sexual relations with defendant. She testified she participated in the extortion scheme with a codefendant, Ryan Persaud. She agreed she participated in telephone and in-person contacts with the victim. In addition to her signed plea forms, defendant signed a guilty plea stipulation, stating that she attempted to obtain money from the widow by threatening to disclose an embarrassing recording.

She did not deny her participation in the crime in her presentence interview. Rather, the presentence report states, "When asked if there were any factors contributing to the

commission of the instant offense[,] the defendant stated that while he was still alive, [the husband] told her to do it and made a voice recording of himself saying he wanted her to have the money."

At her sentencing hearing, she expressed remorse, both in a handwritten letter to the court, and orally, specifically admitting that she made the explicit tape recording. Defendant, an undocumented immigrant from Guyana, maintained to the court before that initial sentencing, that she was employed for many years by the widow and her late husband as a household worker, and that the husband sexually abused and exploited her as a teenager. She asserted that the man ultimately regretted his years of abuse. While suffering from a terminal illness, he suggested that she seek the payment from his widow.

After our first remand, the trial court credited defendant's claim that she had been promised the money. The trial court noted that the "interest of justice" prong of N.J.S.A. 2C:44-1(f)(2) was met, in view of defendant's contention that the widow's late husband had suggested that she seek money from his widow. The court concluded that defendant may have had a sense, albeit misdirected, that she was entitled to the funds.

According to the State's version of the crime, Persaud initially approached the widow at her home in Bergen County,

accompanied by a woman other than defendant. The victim notified the police. With her consent, police recorded subsequent telephone conversations in which Persaud threatened the widow that he would disclose an embarrassing tape if she did not pay $500,000. She offered to make an initial payment of $75,000 at a meeting at her home.

Police surveilled the area the day of the meeting. They observed defendant in the vehicle with Persaud and a driver. However, Persaud aborted the meeting after the victim refused to meet him outside her house, insisting instead that he come inside (where she was accompanied by police). Meanwhile, defendant left the vehicle and headed on foot to a bus stop. Persaud attempted to drive away. Police arrested all three. Persaud gave a statement admitting to the scheme, stating that defendant provided him with the sexually explicit videotapes; identified the widow to him; and provided him with her telephone number and address.

Six months after her sentencing, defendant executed an affidavit professing her innocence, which was prepared in support of her ineffective assistance of counsel claim raised on direct appeal. The affidavit was then submitted to the court in support of the motion to withdraw her guilty plea ultimately heard in 2015.

Defendant claimed that her own abusive father sent her to the United States in 1995, when she was about thirteen years old, to work as a housecleaner under the supervision of her aunt. She began working for the Bergen County couple shortly thereafter. Sexually victimized by her aunt's husband, she left her aunt and lived with a family friend, while continuing to work for the Bergen County couple, whom she considered something of surrogate parents. However, the husband began to engage in sexual relations with her, which she did not feel empowered to refuse or report. She claimed that he also videotaped the encounters, starting when she was fifteen years old. Her employment, and the encounters, continued until 2004, but for one last sexual encounter with the husband in 2007, more than ten years after the first. She claimed the encounter was taped.

Then, after another period of sparse contact, the man met her for the last time in 2010 to tell her that he was terminally ill. He apologized for the pain he had caused her. He gave her "two cds, two audio recorders, and a small digital camera." She claimed that in one recording the man expressed his wish that she receive $500,000 from his wife after his death. A second recording advised defendant that she was to request the money from his wife. The man allegedly instructed defendant to give the cds to his neighbors if his wife refused. Defendant said the recordings included

instances of abuse when she was fifteen, and three later incidents, including the last one in 2007.

Defendant claimed she gave the recordings to Persaud only for safe-keeping, because she was afraid her then-fiancé would discover them, and she had not decided what to do with the recordings. After the elderly man died, defendant claimed Persaud told her that he had viewed the tapes, and urged her to let the widow know about them. Defendant said she refused, and claimed she did not speak to Persaud again about the videos.

Defendant provided an alternative explanation for Persaud's two visits to the widow's home. In the first, she claimed that she only intended to introduce Persaud to the widow to ask her for work for Persaud and his woman companion. (The husband had owned a real estate company.) However, defendant asked to be dropped off at a nearby park, rather than face the widow, because the thought of seeing her, or returning to the home, sickened defendant. She claimed she was unaware that Persaud attempted to extort money from the widow.

The day of the arrests, defendant claimed she accompanied Persaud to the couple's Bergen County town to scout out locations for a store Persaud hoped to open. Defendant eventually realized that Persaud was heading toward the couple's home. She asked Persaud to explain what he was doing. He said that he had been

speaking with the widow and she was ready to give him the money that her husband had promised defendant. He claimed to have all the tapes, to exchange for the money. Defendant claimed she grabbed the recorders and cds, left the car and walked to a bus stop, intending to return to Queens, where she lived. A few minutes later, she refused Persaud's offer for a ride back to New York. She was arrested soon thereafter. She claimed she had the recorders and cds in her possession, although the police later reported they seized them from Persaud.

Defendant blamed her attorney for her decision to plead guilty, rather than go to trial. In her December 2011 affidavit, she said her attorney disbelieved her; he told her the tapes did not substantiate her claims; and he misinformed her about the immigration consequences of her plea. He told her she would serve less than a year on a three year sentence. Defendant claimed, "Not knowing any better and fearful of remaining in prison for ten years, I agreed to follow my lawyer's advice." She added that she was "distraught, scared and lost" while she awaited sentencing. She later discovered, in immigration proceedings, that her conviction would likely lead to her removal.

In an additional certification, executed in August 2015, defendant described the contents of the two recorders, two cds, and camera. She maintained that in one recording, the widow's

husband expressed his desire that she receive $500,000 after his death, and apologized for what he and his wife had done to her. Neither the recordings, nor transcripts of their contents, are before us. Instead, defendant has provided photographic images of the devices and a disc, with the notation that it is blank.

## II.

The court found that defendant had knowingly, voluntarily and intelligently entered her guilty plea, as required by Rule 3:9-2. In assessing defendant's motion to withdraw her plea, the trial court applied the four factors prescribed in State v. Slater, 198 N.J. 145 (2009):

> (1) whether the defendant has asserted a colorable claim of innocence;
>
> (2) the nature and strength of defendant's reasons for withdrawal;
>
> (3) the existence of a plea bargain; and
>
> (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused.
>
> [Id. at 157-58.]

With respect to the first factor, the court held that defendant failed to present specific, credible facts proving her innocence. The court noted that defendant was Persaud's undisputed source for the recordings, and the victim's name, address and telephone number. "The defendant's claim that she was attempting

to make introductions for job opportunities, or scout out store locations, simply does not ring true, especially in light of the extortion attempt and the defendant's view that she was promised and owed money from [the husband]." The court also found incredible defendant's claim she gave the recordings to Persaud because he was a "trusted friend." The court noted that defendant's admissions in her plea stipulation, sentencing letter of apology, and plea form directly contradicted her claim of innocence.

The court also rejected defendant's claimed reasons for withdrawing her guilty plea. Defendant had submitted mental health reports from when she was incarcerated, noting that she was depressed and had difficulty coping with imprisonment; and an evaluation prepared in 2012, concluding she suffered from post-traumatic stress disorder. The court rejected the argument that mental health conditions prompted her to plead guilty despite her innocence. The court noted that defendant denied suffering from any mental health disorder in her presentence interview, and she affirmed during her plea colloquy that nothing impaired her ability to enter her guilty plea. The court recognized "the seriousness and profound impact of sexual abuse," but noted that defendant never formally complained to authorities about the alleged abuse. The court observed that defendant had raised her claim when she

faced deportation and sought a money judgment against the husband's estate.

The court recognized that defendant entered into a plea bargain. Citing State v. Munroe, 210 N.J. 429, 443 (2012), the court acknowledged that the factor is given the least weight, but should not be discounted entirely.

Lastly, the court found that the State would suffer prejudice if forced to try the case so many years later. The court noted that the widow had been diagnosed with Alzheimer's disease. During oral argument, the prosecutor asserted that fact, and invited the court to review transcripts of the victim's most recent deposition taken in the civil action defendant apparently filed against the husband's estate. The court concluded that defendant failed to demonstrate that allowing her to withdraw her plea would serve the interest of justice, or was necessary to correct a manifest injustice.

On appeal, defendant presents one point for our consideration:

> POINT ONE
> [DEFENDANT]'S GUILTY PLEA IS REQUIRED UNDER THE LAW TO BE WITHDRAWN AND THE CONVICTION VACATED.

11

We will disturb a trial court's decision on a motion to withdraw a guilty plea when it is "clearly erroneous," State v. Simon, 161 N.J. 416, 444 (1999), or the trial court exercised a "clear error of judgment," Munroe, 210 N.J. at 448 (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)). "A denial of a motion to vacate a plea is 'clearly erroneous' if the evidence presented on the motion, considered in light of the controlling legal standards, warrants a grant of that relief." State v. Mustaro, 411 N.J. Super. 91, 99 (App. Div. 2009); see also State v. O'Donnell, 435 N.J. Super. 351, 372 (App Div. 2014). The defendant bears the burden of establishing a basis for relief. Slater, 198 N.J. at 156 (noting that a defendant's representations in entering a guilty plea "create a 'formidable barrier' the defendant must overcome") (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

The four Slater factors apply, whether a defendant seeks to withdraw a plea before or after sentencing. Id. at 158. But, "[t]iming matters." Id. at 160. After sentencing, a court may permit a defendant to withdraw a plea only "to correct a manifest injustice." R. 3:21-1. The motion "must be substantiated by strong, compelling reasons." Slater, 198 N.J. at 160.

That heavier "burden[] of proof" requires a different "weighing and balancing process . . . ." Id. at 158. Post-sentencing, "'the court weighs more heavily the State's interest in finality and applies a more stringent standard' than that which is applied to a withdrawal application made before sentencing has occurred." State v. Johnson, 182 N.J. 232, 237 (2005) (quoting State v. McQuaid, 147 N.J. 464, 487 (1997)); see also Munroe, 210 N.J. at 441 (stating "the interest in finality is greater after sentence and entry of a judgment of conviction, and thus the standard for withdrawing a guilty plea is more onerous"). "[T]he longer a defendant delays in seeking to withdraw a plea, the greater burden he or she will bear in establishing 'manifest injustice,' because the prejudice to the State under [factor] four will generally increase. Moreover, a defendant's reasons for delay may also weigh against relief under factor two." O'Donnell, 435 N.J. Super. at 370; see Slater, 198 N.J. at 160 (stating that "[i]n general, the longer the delay in raising a reason for withdrawal, or asserting one's innocence, the greater the level of scrutiny needed to evaluate the claim").

B.

Defendant's challenge to the court's application of the "colorable claim of innocence" factor warrants our most in-depth discussion. We begin with a review of the governing principles.

"A core concern underlying motions to withdraw guilty pleas is to correct the injustice of depriving innocent people of their liberty."  Id. at 158.  "A bare assertion of innocence is insufficient to justify withdrawal of a plea.  Defendants must present specific, credible facts and, where possible, point to facts in the record that buttress their claim."  Ibid.

"[T]he evidence presented in support of the claim of innocence must be specific and raise a legitimate dispute for the jury, but need not clearly exonerate the defendant."  State v. Lipa, 219 N.J. 323, 334 (2014).  Put another way: "A colorable claim of innocence is one that rests on 'particular, plausible facts' that, if proven in court, would lead a reasonable factfinder to determine the claim is meritorious."  Munroe, 210 N.J. at 442 (quoting Slater, 198 N.J. at 158-59).

In considering the "colorable claim of innocence" factor, the trial court must not usurp the function of a jury.  "[T]he motion judge need not be convinced that [a defendant's innocence claim] is a winning argument because, in the end, legitimate factual disputes must be resolved by the jury."  Munroe, 210 N.J. at 442; see also Lipa, 219 N.J. at 333-34.  However, the trial judge must still distinguish between "a colorable claim of innocence" and a "bald assertion."  Id. at 334.  Doing so requires a judge to engage

in some weighing of evidence to determine whether facts are "credible" or "plausible." Id. at 333-34.

"[C]ourts may look to 'evidence that was available to the prosecutor and to the defendant through our discovery practices at the time the defendant entered the plea of guilt.'" Slater, 198 N.J. at 158-59 (quoting State v. Smullen, 118 N.J. 408, 418 (1990)). "Although the State is not obligated to offer any evidence at a motion to withdraw," it may do so to "undermine the colorable nature" of a defendant's claim of innocence. Id. at 163. On the other hand, a court may consider the State's failure to offer evidence that belies a defendant's claim. Ibid. (noting the State's failure to offer evidence to contradict the defendant's claim that he did not rent a motel room where drugs were found); Munroe, 210 N.J. at 445 (considering the State's failure to offer witness statements contradicting the defendant's claim he could not retreat from a knife-wielding victim).

In Slater, Munroe, and Lipa, the defendants sought to withdraw their guilty pleas before sentencing. In each case, the Court found that the trial court erred in denying the motion. In Slater, the defendant pleaded guilty to possession with the intent to distribute cocaine after police discovered the drugs and a scale in a motel room he occupied. 198 N.J. at 151. Slater admitted in his plea colloquy that he was "going to sell or share some" of

the drugs.  Id. at 152.  Less than two weeks later, before sentencing, Slater sought to withdraw his plea, contending that he had not rented the motel room; he was just visiting; he was unaware the drugs were in the room; and the drugs did not belong to him.  Id. at 152-53.  Slater's story was supported by the record evidence that the police approached the motel room in search of two white men who allegedly possessed cocaine; but, Slater was African-American.  Id. at 151-52, 163.  Also, the State failed to disprove Slater's claim that he did not rent the room and was only visiting.  Id. at 163.

Applying Slater, the Court in Munroe held that the defendant, who pleaded guilty to aggravated manslaughter, presented a colorable claim of innocence in his presentence motion to withdraw his plea.  210 N.J. at 446-47.  The defendant supported a self-defense claim with evidence that the victim threatened him with a knife, and a parked car blocked the defendant's retreat.  Id. at 445.  A police report confirmed the deceased victim was found with a box cutter in his hand.  Id. at 447.  The State presented no witness statements contradicting Munroe's claim he had no room to retreat.  Id. at 445-46.  Munroe's admission in his initial plea colloquy that he shot the victim at close range was not inconsistent with his later claim of self-defense.  Id. at 445. "[N]ot a word that defendant uttered in court during his plea

colloquy was inconsistent with either the account he gave to the probation officer who prepared his presentence report or his sworn testimony when he moved to withdraw his guilty plea." Ibid.[1]

In Lipa, the defendant raised a colorable claim of innocence when he denied he sexually assaulted a victim three times. 219 N.J. at 326-28. He presented photographic evidence of a knee injury that, he claimed, made it impossible for him to climb into the victim's second-floor bedroom window, as she alleged. Id. at 333. The Court noted that the victim's assertion that Lipa was inebriated when he committed the offenses tended to undermine the claim that he had the physical capacity to commit the offense as described. Ibid. Lipa also presented evidence that the victim made allegedly false sexual assault claims against others in the past. Ibid. Unlike Munroe, however, Lipa's claim of innocence was factually inconsistent with his admissions during the plea colloquy, but the Court noted they were presented in answer to leading questions. Id. at 327.

_____

[1] Although the Court likened Munroe to Slater, Munroe's claim of innocence appears stronger. Munroe did not address his state of mind in his allocution, and his admission that he pulled the trigger that killed the victim was entirely consistent with his self-defense claim. On the other hand, Slater's claim of innocence was inconsistent with his admission that he possessed the cocaine with the intent to sell or share it.

We draw from these cases the principle that a defendant may present a plausible claim of innocence, even if inconsistent with his or her prior admission of guilt.  But, a claim of innocence is more likely to be deemed "colorable" if it does not directly, or completely contradict the factual admissions in the initial allocution of guilt.  Evidence corroborating a defendant's claim of innocence supports the claim's plausibility, as does the State's failure to present evidence on easily verifiable facts that would undermine the defendant's claims.

Turning to defendant's claim of innocence, she contends that the crime of attempt was never consummated because Persaud left the scene before transferring the tapes for the money, and defendant abandoned the vehicle and headed to a bus stop, allegedly with the recordings.  Alternatively, she contends her actions constituted renunciation.  She does not highlight her claim that she was unaware of Persaud's extortion scheme, or her explanation as to why she twice accompanied him to the town where the victim lived.

We note at the outset that defendant does not expressly contend she failed to present an adequate factual basis under Rule 3:9-2.  Rather, she seems to argue that the record evidence did not support her admission of guilt.

We acknowledge that an adequate factual basis is a threshold determination, which precedes analysis of the Slater four-factor test for withdrawing a plea. See State v. Tate, 220 N.J. 393, 404-05 (2015). Defendant admitted that she and Persaud contacted the victim, by telephone and in person, seeking money from the victim in return for not disclosing a sexually explicit videotape that would cause the victim embarrassment. We are satisfied that defendant's allocution sufficiently established the elements of the offense of attempt to commit extortion. See N.J.S.A. 2C:20-5(c) (stating a person commits theft by extortion if the person "purposefully and unlawfully obtains property of another by . . . purposely threaten[ing] to . . . [e]xpose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule . . . .);[2] N.J.S.A. 2C:5-1(a)(3) (stating a person is guilty of attempt if, acting with the required culpability, "does . . . anything which, under the circumstances as a reasonable person would believe them to be,

_____

[2] Notably, defendant does not raise the affirmative defense "that the property obtained was honestly claimed as restitution or indemnification for harm done in the circumstances or as lawful compensation for property or services." N.J.S.A. 2C:20-5. Despite her claim that the husband told her to release the tapes if his wife did not pay her, defendant contends she never followed through.

is an act . . . constituting a substantial step in the course of conduct planned to culminate in [her] commission of the crime").[3]

We are unpersuaded by defendant's argument that the record demonstrates there was, in fact, no attempt. It is of no moment that money did not pass hands on the aborted second trip to the victim's home. Persaud's recorded conversations disclose an undeniable effort to extract $500,000 from the victim, by threatening to disclose embarrassing materials. Even if defendant did not appear with Persaud in his visit to the victim's home, or participate in the phone calls to the victim, she took substantial steps, by providing Persaud with the tapes and the victim's information, in the course of conduct designed to culminate in the extortion of $500,000 from the victim.

We also reject defendant's claim that she presented a colorable claim of innocence by renouncing the scheme. She could renounce only if she had the requisite culpability in the first place. Renunciation applies only "[w]hen the actor's conduct would otherwise constitute an attempt under [N.J.S.A. 2C:5-1(a)(2) or (3)] . . . ." See N.J.S.A. 2C:5-1(d). To establish the affirmative defense, a defendant "must prove by a preponderance of the evidence that he [or she] abandoned his [or her] effort to

---

[3] The indictment did not specify the relevant subsection of the attempt statute. But, subsection (a)(3) appears to apply.

commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his [or her] criminal purpose." Ibid. Defendant contends in her December 2011 affidavit that she never intended to commit extortion.

To establish a colorable claim of innocence after a plea of guilty, a defendant should surely present only one version of the facts. "Although a party may argue inconsistent principles of law, he [or she] cannot be heard . . . to contend for two diametrically opposed sets of facts." In re Estate of Perrone, 5 N.J. 514, 527 (1950).

Even if we presume defendant only meant to argue that her actions foiled Persaud's plan of which she was previously unaware, she failed to establish a colorable claim of innocence. The facts essential to her claim of innocence are neither "credible" nor "plausible." The trial court fairly concluded that defendant's version of events simply did not ring true. Notably, defendant did not present the trial court with any competent evidence of the recordings' contents to verify her allegations. In any event, evidence that she was a victim of the husband's assaults — as reprehensible as that would be — does not prove her ignorance of Persaud's scheme. Moreover, there is no evidence — except her own

say so — that she took the embarrassing materials when she left the car, in order to foil Persaud's plan.

Defendant's contradictory assertions differ greatly from the claims the Court has deemed "colorable." The defendant in <u>Munroe</u> presented facts that supplemented the allocution of guilt, and constituted a defense. 210 N.J. at 445. By contrast, defendant has presented facts in her December 2011 affidavit that directly contradict the facts presented in her allocution, and presentencing statements. Lipa presented evidence that supported his claim of innocence — including photographs of his knee injury. 219 N.J. at 333. Defendant presents no comparable evidence to corroborate her claimed innocence. Rather, her admission of guilt is supported by the undisputed facts that she provided the tapes to Persaud and accompanied him on two trips to the victim's town. Significantly, defendant filed her motion after sentencing, when the burden is heavier.

In sum, we agree with the trial court that defendant failed to present a colorable claim of innocence. This factor disfavors permitting defendant to withdraw her plea.

### C.

Defendant's challenge to the court's analysis of factors two, three and four, does not warrant an equally extended discussion. Factor two requires a court to consider "whether defendant has

22

presented fair and just reasons for withdrawal, and whether those reasons have any force." Slater, 198 N.J. at 159. Defendant contends her attorney was ineffective by failing to review discovery materials and misinforming her about the immigration consequences of her plea. However, the discovery materials, even if they contained all that defendant alleges, would, at most, have established that she was a victim of the husband's exploitation. It would not have established her claim that she was ignorant of Persaud's scheme, and did not participate in it. Indeed, her claim that the husband actually advised her to disseminate the tapes to neighbors if his wife did not pay her, would seem to support the State's case that she actually attempted to follow his directions.

As for the claim that her plea counsel mistakenly advised her about the immigration consequences of her plea, we previously noted:

> [I]n her plea hearing, the judge elicited defendant's acknowledgement that "as a result of your guilty plea . . . you will be subject to [a] deportation proceeding[.]" Defendant also signed a form, in addition to the plea form promulgated pursuant to Directive #14-08, advising her that "there is a substantial likelihood that you will be deported, and your deportation should not be a surprise, but should be anticipated as a result of this guilty plea."
>
> [Williams I, slip op. at 3 n.1.]

Lastly with respect to factor two, defendant contends that she pleaded guilty because she was suffering from the emotional and psychological effects of years of abuse. She has presented evidence that she was despondent and depressed while incarcerated. Yet, she has presented no compelling evidence that any emotional or psychological condition led her to plead guilty, as opposed to maintain her innocence of the charges against her. In sum, defendant has failed to present compelling reasons for withdrawing her plea on that basis.

Turning to factor three, the trial court acknowledged the existence of a plea bargain is generally not "given great weight in the balancing process." See Slater, 198 N.J. at 161. Yet, the interests in finality, which must be balanced against a defendant's interest in withdrawing a plea, are shared not only by the State, but by the crime victim. "The victims of an offense also have an obvious interest in the finality of criminal proceedings." Id. at 155.

The plea bargain here not only saved the State from the burden of a trial; it shielded the victim from the emotional turmoil of testifying at such a trial, and the embarrassment of a public trial, whether she testified or not. The revival of these issues, long after the case was apparently resolved, exacts an even greater

24

toll on the victim, than if the defendant had insisted upon a trial in the first place. Just as "[c]ourts taking pleas are undoubtedly conscious of the need to end the suffering" of child-sexual-assault victims, see Smullen, 118 N.J. at 418, the court must be conscious of the need to end the suffering of the victim in this sexually-tinged extortion case. This factor weighs against granting defendant's motion to withdraw her plea.

Lastly, we discern no error in the court's determination that the State would suffer prejudice if forced to try this case many years after the events. See Slater, 198 N.J. at 161 (factor four). The trial court accepted the assistant prosecutor's representation that the victim, who was then ninety years old, had Alzheimer's disease. We recognize that the State did not present competent evidence of the victim's medical condition. The assistant prosecutor merely contended that indications of the victim's disability would be evident in her recent deposition. On the other hand, defendant bore the burden to establish grounds for her withdrawal. She has not attempted to contest the assistant prosecutor's point by providing us with the victim's deposition transcript.

In sum, we discern no abuse of discretion in the court's analysis of the Slater factors, and its denial of defendant's post-sentence motion to withdraw her plea. To the extent not

25

addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION