# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3508-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

S.B.,[1]

    Defendant-Appellant.

_____

> Submitted January 23, 2025 – Decided May 22, 2025
>
> Before Judges Marczyk and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 14-03-0417.
>
> Bailey & Toraya, LLP, attorneys for appellant (Adam W. Toraya, on the brief).
>
> Esther Suarez, Hudson County Prosecutor, attorney for respondent (Celia R. Morrison, Assistant Prosecutor, on the brief).

---

[1] Consistent with our prior opinion, we use initials to protect the victim's privacy. See R. 1:38-3(c)(12).

PER CURIAM

Defendant, S.B., appeals from a June 27, 2023 order denying in its entirety his petition for post-conviction relief (PCR). After careful review of defendant's claims, the PCR hearing record, and applicable legal principles, we affirm substantially for the reasons set forth by Judge John A. Young, Jr., in his series of well-reasoned written opinions dated June 23, 2022, and June 27, 2023.

## I.

### A.

Defendant twice stood trial on an indictment charging him with first-degree kidnapping, N.J.S.A. 2C:13-1(b) (count one); third-degree criminal restraint, N.J.S.A. 2C:13-2 (count two); third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count four); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count five); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count six); third-degree aggravated assault with an attempt to cause significant bodily injury, N.J.S.A. 2C:12-1(b)(7) (count fourteen); third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (count fifteen); and eight counts of aggravated sexual assault, N.J.S.A. 2C:14-2(a) (counts three, seven, eight, nine, ten, eleven, twelve, and thirteen). After trial in February 2015, a jury found defendant not

A-3508-22

guilty on counts four and fourteen, guilty of simple assault as a lesser-included offense of count fourteen, and could not reach a verdict on the remaining charges.

After retrial in September 2015, defendant was convicted of counts one, two, three, thirteen as amended to second-degree sexual assault, fourteen as amended to simple assault, and fifteen, and not guilty of the remaining counts. After merger, the court sentenced defendant to life imprisonment, without parole, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on count one, concurrent to the sentences on the remaining counts.

We denied defendant's direct appeal in 2018, see State v. S.B., No. A-3705-15 (App. Div. June 27, 2018) (slip op. at 22), and summarized the facts presented at defendant's retrial from which we distill the following information pertinent to this appeal.

In 2013, the victim, K.G., encountered defendant when she went to Hudson County Social Services and locked her keys in her car. Id. at 2. After defendant assisted her in unlocking her car, he falsely claimed to be "a supervisor at Social Services and that he had employment positions he needed to fill." Ibid. K.G. gave defendant her phone number. When defendant texted

K.G. "requesting her resume," K.G. hand-delivered it to defendant the next day in the same parking garage where they met. Id. at 3.

The following day, defendant texted stating he had "good news," and advised that he secured her an interview and suggested she "meet him at a bowling alley to talk about the position and 'hang out.' K.G. agreed." Ibid.

The two met, but defendant informed K.G. he forgot his money, and he needed to return to his apartment. K.G. accompanied him. We previously summarized K.G.'s account of the attack that followed:

> Once inside of the apartment, K.G. observed that defendant had a knife in his hand. According to K.G., defendant struck her in the face, said "shut up, b[****]," put the knife to her back, and guided her to the bedroom. Defendant told K.G. that she and her brother had robbed him, and directed that she remove her clothes so that he could look for a tattoo. K.G. removed her clothes, and defendant said she was not the person who had robbed him and told her to put her clothes back on. Moments later, defendant told K.G. he did not like the way she looked at him, and ordered her to remove her clothes again.
>
> K.G. testified that defendant continued to threaten her with the knife, forced her to perform fellatio, and tied her hands and feet to the bed with belts. Over the course of the following six hours, defendant struck and punched K.G., threatened her, and repeatedly penetrated her vaginally and anally. K.G. also reported defendant performed cunnilingus against her will.

4

[Id. at 3-4.]

K.G. explained that when defendant fell asleep, she escaped her restraints, took the knife, and stabbed defendant to "slow him down if he pursued her." Id. at 4. Defendant awakened as K.G. ran from the apartment and knocked on a neighboring apartment door while screaming. "Defendant pursued K.G. and attempted to pull her back into his apartment. Still armed with the knife, K.G. stabbed defendant, who punched K.G. in the mouth. K.G. continued stabbing defendant until the blade broke apart from the knife's handle." Ibid. "[N]aked[ and] covered in blood," K.G. roused a neighbor who called 9-1-1, after which both defendant and K.G. were transported to the hospital. Id. at 4-5.

"K.G. had scrapes and scratches on her body, a bruised face, a cut on her lip, a bruised wrist and a laceration on her left arm." Id. at 5. It was undisputed that defendant was seriously injured.

Surveillance from the parking garage played at trial confirmed defendant and K.G. met, and K.G. handed defendant an envelope. DNA tests and the State's expert forensic analysis "established that defendant was the source of the blood found on K.G.'s back and right leg, and that he was a possible DNA contributor to what may have been saliva taken from K.G.'s vaginal swabs." Id. at 6. The State's expert testified "concerning her report describing the results of

the DNA analysis, and the report was admitted in evidence without objection."

Ibid.

Defendant did not testify at either trial, but filed a Sands/Brunson[2] motion that was never heard before either trial. Judge Young presided over both trials and at each trial engaged defendant in colloquies during which defendant acknowledged that he understood his right to testify was his own, discussed this right with his attorney, and elected not to testify on his own behalf.[3]

At the second trial, the judge addressed defendant regarding his right to testify:

> It . . . appears . . . that the State is going to rest tomorrow. In light of that, I just want to advise you, although I'm sure you spoke to [trial counsel] at length, you do have an absolute right to testify, and that right is your right. You also have a right not to testify and that right—and that decision is your decision.
>
> I certainly urge that you speak to your attorney about what you'd like to do, but ultimately it's your decision whether you want to testify or not. If you choose not to testify, you can ask me to instruct the jury

---

[2] State v. Sands, 76 N.J. 127 (1978); State v. Brunson, 132 N.J. 377 (1993).

[3] In granting an evidentiary hearing on the issue of counsel's advice to defendant regarding the right to testify at the second trial, Judge Young noted he "conducted voir dire . . . during [defendant]'s first trial. Thus, [defendant] was advised of his absolute, constitutional right to testify on at least four separate occasions: February 18, 2015; February 19, 2015; September 22, 2015; and September 23, 2015." (Emphasis omitted).

and I can give you the specifics[.] . . . [T]he instruction to them is you didn't testify, you have a right not to testify, and that you enjoy the presumption of innocence whether you testify or not and the fact that you didn't testify can't be used in any way, shape or form as part of their deliberations.

[(Emphasis added).]

The judge stated he was "not looking for an answer," but "just want[ed] to remind [defendant] of that right so [he] ha[d] the night to think about it and . . . the opportunity to speak to counsel further before [he was] called on to make that decision."

After the close of the State's case, Judge Young placed defendant under oath and asked:

THE COURT: Okay. . . . I spoke to you at the close of [c]ourt yesterday regarding your right to testify or not testify. Have you had enough time? . . . [W]e've now reached the point where the State's rested. It's time [for] the defense['s] case. Have you had enough time to decide whether you're going to testify or not?

[DEFENDANT]: Yes. No, I won't.

THE COURT: You don't want to testify?

[DEFENDANT]: No, sir.

THE COURT: Have you spoke . . . to [trial counsel] about whether you want me to give the instruction to the jury about your right not to testify?

7

[DEFENDANT]: Yes.

THE COURT: Okay. And I will give that then.

At sentencing after defendant's conviction, the State presented defendant's prior history, which was uncontested[4] and included "six prior felony convictions," beginning with two separate first-degree robbery convictions in 1993 for which he received twelve years' imprisonment with four years' parole ineligibility. The prosecutor also represented, and defendant concurred, defendant was convicted of "possession of a weapon for an unlawful purpose" in 1993 and "sentenced to a term of ten years with a three[-]and[-]a[-]half[-]year parole ineligibility . . . [in] 1993;" convicted of "conspiracy to commit wrongful impersonation" in 2004 and "sentenced to . . . [p]robation." In 2007, "he was remanded to the custody of the Department of Corrections for a term of six[-]and[-]a[-]half years for second[-]degree eluding."

On appeal, we rejected defendant's challenges to certain trial testimony, the admission of the State's forensic expert report, and the form of the verdict sheet.

---

[4] We were not provided with judgments of convictions, but the parties appear to concur regarding the nature and dates of the convictions.

B.

Defendant submitted a pro se PCR petition on July 20, 2021, which PCR counsel supplemented with a brief and accompanying certifications. He raised claims that trial counsel was ineffective for failing to: (1) renew, prior to his second trial, his motion to present his own medical expert regarding his injuries, which had been denied at the first trial; (2) advise defendant of his right to testify and request a Sands/Brunson hearing; (3) move for a new trial; and (4) investigate and present witnesses to show K.G. fabricated her claims.

In support of his petition, defendant submitted a certification from his brother claiming that someone else told him that K.G.'s roommate stated K.G. told the roommate that she lied about being sexually assaulted. He also submitted a certification from his "close friend" also claiming the roommate stated K.G. admitted she tried to kill defendant when he did not pay her for sex. Both certifications indicated this information was relayed to the State; but when investigators interviewed the roommate, she denied any knowledge of K.G.'s allegations. Defendant further alleged trial counsel should have investigated and presented evidence that K.G. was a stripper and sued her employer at an adult strip club after allegedly being fired for her "aggression."

He also claimed appellate counsel was ineffective for failing to sufficiently raise these claims. He similarly alleged trial court errors in excluding defendant's medical expert, in charging the jury, and addressing the form of the verdict sheet and jury questions related to the charges.

Regarding counsel's advice concerning his right to testify, defendant claimed trial counsel failed to move forward with a Sands/Brunson hearing and did not properly advise him whether his pending charges or prior convictions would be admissible at trial. Defendant also had pending charges of a similar nature involving a separate victim at the time of his trials, and alleged he was misinformed that the jury could be told about the open charges if he testified.

After arguments, by order dated June 23, 2022, and accompanying written decision, Judge Young found any challenges to alleged trial court errors in formulating and addressing the jury verdict sheet were barred by Rule 3:22-5 "[t]o the extent . . . raised and decided on the merits on direct appeal." The court also determined defendant waived any claims that the trial court erred in its jury instructions and exclusion of expert testimony as those challenges were available and should have been raised on direct appeal, citing Rule 3:22-4.

Regarding ineffective assistance of counsel claims, the court found defendant did not make a prima facie showing that trial counsel was deficient

for failing to: (1) call a medical expert, finding defendant did not demonstrate how a medical expert would have been effective when the victim admitted to stabbing defendant; (2) move for a new trial, finding the evidence "was strong" against defendant, and the verdict was not against the weight of the evidence and turned on the jury's credibility findings of the State's sixteen witnesses; (3) call as a witness K.G.'s roommate, finding defendant presented only hearsay and nothing from her roommate to show she was available or willing to testify, noting the roommate told detectives she knew nothing about the allegation; and (4) investigate and present evidence about K.G.'s employment, deeming defendant's claims unpersuasive and "inaccurate" and citing to trial counsel cross-examining K.G., "significant[ly] attempt[ing] to undermine her credibility," and actually eliciting testimony from her regarding her "employment as a 'bottle girl.'"

Judge Young ordered an evidentiary hearing on the claim that trial counsel failed to appropriately advise defendant regarding his right to testify or pursue a Sands/Brunson hearing.

Defendant's trial counsel, defendant's brother, and defendant all testified. Trial counsel testified that he considered defendant "smart enough to certainly take the stand and testify," but then clarified that "whether or not it [wa]s in his

best interest" to testify was a different question. Counsel indicated that given the passage of time, he could not recall specifics of what he discussed with defendant regarding his possible testimony, but he recalled:

> We discussed all aspects of his testifying, all right, the calculus in terms of what weight it might have, the calculus in terms of what his prior record might have in terms of that. And I think we collectively decided what was in his best interest, notwithstanding the . . . notion of self-defense . . . . We did discuss these things.

Counsel explained that because the first jury was deadlocked without defendant's testimony, he believed he could again raise the same issues at the second trial without "putting [defendant] at risk" of cross-examination. He maintained the two discussed "at length" "his prior record, how that might be perceived by the jury, . . . the nature of those charges, [and] how he might be exposed to . . . questions that maybe we can[not] anticipate." He indicated defendant's prior history was "a primary factor" in advising him about his decision.

Counsel explained his strategic view that defendant's wounds "spoke [for] themselves" and did not require defendant's testimony that he was stabbed repeatedly by K.G., which was not disputed. Trial counsel emphasized "there were other means and methods by which [he] could get the equivalent of his

12 <span>A-3508-22</span>

testimony," which he believed he did effectively in the first trial, serving as a "blueprint" for the second trial. Trial counsel opined it was not "worth the risk."

Counsel stated that he advised defendant "[t]hat his admissible convictions would be brought to the jury's attention," and explained his belief that although at the first trial he "effectively cross-examined [K.G.], she had some appeal as a witness and might be believed[,] . . . so this would dirty [him] up in a way." Counsel could not "recite . . . exactly what [he] said," but knew that he "told [defendant] all aspects of what [he] understood the law to be at that time." He indicated the prior convictions "were troubling" and they "talked about it."

He continued:

> I'm not sure how I put it, but I . . . said that there– and I don't remember what the charges were, but I said that it's a strong likelihood that several of these convictions would be brought before the jury and we have to think about what the impact of that would be because this is in large part a beauty contest, right, it's not—we'd like to say it's a search for the tr[uth]. It's a search for the perception of the truth. And if they start hearing things about you that are negative, you got to deal with that if you take the stand. That may not be a good idea, it might not be a good idea.

He elaborated that they "discussed the weight, value[,] and pros and cons of him taking the stand, of his record coming in, of whatever his convictions were, all

of the questions that [the court] might want to ask[] . . . .  Yeah, the answer's yes."

Specifically addressing what he recalls advising defendant about pursuing a Sands/Brunson hearing, counsel indicated:

> I said that there's an application that can be made to the court to review your prior criminal history and make an assessment that if you were to take the stand[,] certain cases or certain convictions went before the jury and the consequences of what that can be.
>
> And I know I discussed it in the first trial and certainly in the second trial as well, . . . what the consequences were of taking the stand and what the process is if . . . there's a hearing, what the court would do and . . . the likelihood of certain[] convictions coming in.

When asked if he prepared defendant to testify over the course of their meetings in preparation for trial, counsel indicated they "both decided it's not a good idea, no matter how much [they] prepared."

Counsel confirmed, however, his belief that "at the end of the day . . . it's his case.  It's not my case, not your case.  Doesn't work out, consequences go to him.  So[,] I don't necessarily make decisions for him.  I give him advice."  He maintained that if defendant insisted on taking the stand he "would say you and your family paid me for advice and . . . that is advice that you don't take the

stand, I'm going to recommend you don't. If you insist on taking the stand, damn it, it's your life, take the stand."

Defendant's brother testified that he retained defendant's trial counsel, and discussed with counsel defendant's desire to testify and recalled counsel advising that defendant would be questioned about his prior criminal history. Although admittedly never present during meetings with defendant and counsel, he recalled counsel suggesting to him that the prosecutor could refer to additional pending charges against defendant should he testify.

Defendant testified that he was hospitalized and in an induced coma for around twenty-three days after being stabbed, and, at the first trial, his memory loss impeded his memory of events. He contended that, despite trial counsel's concern for his inability to recall details, "[b]y the time the second trial was taking place," he believed he could have testified, having listened to the victim's story in the first trial and "started [to] get[] [his] memory back."

Defendant recalled preparing his testimony with trial counsel, and defendant felt he was able to answer the questions. He claimed he only learned he would not testify when the State rested, which resulted in an argument with trial counsel. When asked about his representations to the court regarding his decision not to testify, defendant claimed trial counsel pressured him not to

15

testify because his "record would come out," without explaining the Sands/Brunson motion or that the nature of his criminal offenses could be sanitized. This caused him to be "under the impression that not only would [his] criminal convictions be made known to the jury but also [his pending charges]." He claimed trial counsel informed him his "pending trials would come out" and the prosecutor would use those charges to "make [it] look like this was [his] M.O."

Defendant conceded that, despite his assertions regarding trial counsel and the jury's guilty verdict, trial counsel represented him at a subsequent trial on different pending charges, claiming his brother refused to fire counsel.

In supplemental briefing, defendant claimed trial counsel did not pursue a Sands/Brunson hearing because "trial counsel did not properly conduct an investigation, [and did not] have the requisite knowledge of the law." He alleged "the record unequivocally corroborate[d defendant]'s averments that he wanted to take the stand[,] and the [State] presented no evidence to contradict" this, as trial counsel's testimony showed "he could not remember if [defendant] wanted to take the stand." Defendant claimed trial counsel's explanation that trial is a "beauty contest" reflected "[in]correct advice." He argued he was deprived of

"effective assistance of counsel . . . due to counsel's lack of sufficient knowledge and . . . a valid coherent trial strategy."

Judge Young denied defendant's claim in a comprehensive written decision accompanying his June 27, 2023 order. The judge first assessed credibility, finding trial counsel's testimony "highly credible," defendant's brother's testimony "credible," and defendant's testimony "not . . . entirely credible" as it "defie[d] the trial record" that showed defendant was repeatedly advised at his second trial of his right to testify after also being advised of those rights in his first trial. The judge rejected defendant's claim that "trial counsel never discussed the admissibility of his prior convictions," citing defendant's conflicting claim that "trial counsel told him if he testified at trial, the State would make this incident look like a pattern of behavior because of his pending charge[s]."

Crediting trial counsel's "extensive" testimony that he discussed with defendant before both trials "whether [defendant] would testify," the judge accepted trial counsel's "firm[] belie[f that defendant's] testifying was an excessive risk" considering the victim's testimony, defendant's prior record, and counsel's ability to elicit evidence effectively without calling defendant to testify. The court deemed reasonable trial counsel's belief that defendant's stab

17 <span>A-3508-22</span>

wounds together with cross-examination of the victim was preferable to risking defendant's testimony, and "[g]iven the result of [defendant]'s first trial and the circumstances of [the] case, it [was] a significant probability that [defendant]'s testimony would likely have been more harmful than helpful to him."

The court was satisfied that counsel "discuss[ed] a Sands/Brunson hearing with defendant" and "adequately apprised [him] of the potential ramifications of him testifying, particularly, that some of his prior convictions would be presented to the jury."  Accordingly, the judge denied the PCR petition.

II.

Defendant raises the following arguments on appeal:

POINT I

DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY PROVIDED INCORRECT LEGAL ADVICE REGARDING HIS RIGHT TO TESTIFY AT TRIAL IN VIOLATION OF U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PAR. 10.

A. THE PCR COURT ERRED IN FAILING TO FIND THAT TRIAL COUNSEL HAD IMPROPERLY TOLD DEFENDANT THAT HIS PENDING CRIMINAL CHARGES WOULD BE USED AGAINST HIM IF HE TESTIFIED AT TRIAL.

B. THE PCR COURT ERRED IN FAILING TO FIND THAT TRIAL COUNSEL HAD IMPROPERLY COMPARED A CRIMINAL TRIAL TO A "BEAUTY

18

CONTEST" INSTEAD OF PROPERLY EXPLAINING THE LAW UNDER SANDS/BRUNSON.

POINT II

THE [PCR] COURT ERRED IN DENYING THE DEFENDANT'S PETITION FOR [PCR] WITHOUT AFFORDING HIM AN EVIDENTIARY HEARING TO FULLY ADDRESS HIS CONTENTION THAT HE FAILED TO RECEIVE ADEQUATE LEGAL REPRESENTATION FROM TRIAL COUNSEL.

A. DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING TRIAL COUNSEL'S FAILURE TO ADEQUATELY ADVI[S]E HIM ABOUT TESTIFYING IN ORDER TO ALLOW HIS REQUEST FOR A JURY CHARGE ON SELF[-] DEFENSE TO BE GRANTED.

B. DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING HIS REMAINING ISSUES.

III.

PCR "is New Jersey's analogue to the federal writ of habeas corpus," State v. Preciose, 129 N.J. 451, 459 (1992), and provides "a built-in 'safeguard'" for those "unjustly convicted," State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)). We are "necessarily deferential to a PCR court's factual findings based on its review of live witness testimony" and "uphold the PCR court's findings that are supported by sufficient credible

19

evidence in the record."  Ibid.  However, our review of the PCR court's legal conclusions is de novo.  Id. at 540-41.

To succeed on a claim of ineffective assistance of counsel, a defendant must establish both prongs of the test set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984)[5] by a preponderance of the evidence.  See State v. Gaitan, 209 N.J. 339, 350 (2012).  First, defendants must show that "counsel's performance was deficient," demonstrating that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  The Constitution requires "reasonably effective assistance" and may not be attacked unless it "fell below an objective standard of reasonableness."  Id. at 687-88.

When assessing the first Strickland prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight."  Id. at 689.  "Merely because a trial strategy fails does not mean that counsel was ineffective."  State v. Bey, 161 N.J. 233, 251 (1999).  Under the second prong of the Strickland test, the defendant must show that "the deficient performance prejudiced the defense."

---

[5]  The New Jersey Supreme Court adopted the Strickland test in State v. Fritz, 105 N.J. 42, 58 (1987).

466 U.S. at 687. This means that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid. Both prongs must be satisfied to merit relief. See Gaitan, 209 N.J. at 350.

We first consider and reject defendant's claim that the PCR court erred in denying defendant's claims alleging counsel's inadequate advice regarding testifying. Judge Young held an evidentiary hearing to explore counsel's advice and the impact of any deficiency on the outcome of the case. The court heard testimony from defendant, his brother, and his trial counsel and subsequently rendered a thorough decision denying defendant's claim.

After reviewing the record, we conclude the PCR court's factual findings that counsel's representation and advice regarding defendant's right to testify were not deficient are fully supported by the record and, thus, the legal conclusions based on those facts are sound. We therefore affirm substantially for the reasons expressed in the judge's well-reasoned opinion. We add only the following comments.

We recognize "[c]riminal defendants have a constitutional right to testify on their own behalf," Bey, 161 N.J. at 269, and counsel must advise of that right and "not merely rely on their own trial strategy." Id. at 270.

Although counsel could not recall with precision the specific language he

21

used to advise defendant, we are satisfied Judge Young determined that proper advice was given. The judge carefully considered the evidence, after observing the witnesses and presiding over both trials, and accepted counsel's testimony that he informed defendant that he had the right to decide whether to testify, that he could be confronted with his prior convictions which would undermine the credibility of his testimony, that defendant's account of events could be elicited from other witnesses and evidence as it had been with some success at the first trial, and that defendant had not established how the outcome would have been different if he had proceeded with a Sands/Brunson hearing and testified at trial.

We discern no abuse of discretion in these findings, as Judge Young had inquired of defendant at both trials whether he understood his right to testify, that the decision was defendant's, and whether he had discussed that decision with counsel, and defendant consistently confirmed his understanding and advised of his election not to testify. We similarly perceive no error in the court's finding counsel's advice against testifying was reasonable in these factual circumstances, further informed by hindsight to the first trial.

We similarly affirm the court's order denying defendant's remaining PCR claims. As expressed by Judge Young in his 2022 written decision rejecting defendant's assertions, we find those claims either barred as already raised on

22

direct appeal, see R. 3:22-5; waived as available but omitted from direct appeal, see R. 3:22-4; or lacking substantive merit warranting additional discussion, see R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3508-22