**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3416-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LUQMAN ABDULLAH,

    Defendant-Appellant.

_____

> Argued April 9, 2025 – Decided July 29, 2025
>
> Before Judges Paganelli and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 09-10-0928 and 09-10-0929.
>
> Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).
>
> Meredith L. Balo, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Meredith L. Balo, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Luqman Abdullah appeals from a June 9, 2023 Law Division order denying his application for post-conviction relief (PCR) without an evidentiary hearing, and a December 8, 2023 order denying his motion for reconsideration. Having reviewed the record in light of applicable legal principles, we affirm.

I.

We derive the following salient facts and procedural history from the record and our decision on direct appeal, State v. Abdullah, No. A-5547-16 (App. Div. Oct. 18, 2019).

A.

In 2016, defendant was convicted after a jury trial of first-degree racketeering, N.J.S.A. 2C:41-2(c) and -2(d), and related firearms and drug distribution offenses and sentenced to an aggregate term of thirty-two years' imprisonment.[1] See id. at 21. As we previously summarized, defendant's conviction resulted from an expansive "joint narcotics investigation, targeting a

---

[1] Defendant was separately indicted and convicted as a certain person prohibited from possessing weapons, N.J.S.A. 2C:39-7.

A-3416-22

suspected drug distribution network" in 2009, involving "numerous law enforcement agencies in Union County, including the Federal Bureau of Investigation." Id. at 2. Wiretaps and other investigation led law enforcement to identify Abdul Hassan as the supplier of local drug dealers. See ibid. The investigation into Hassan revealed a connection to defendant. See ibid.

Tracking devices on several vehicles driven by defendant revealed defendant frequented an apartment building on Chancellor Avenue in Newark, often staying no longer than "ten to fifteen minutes." Id. at 3. Defendant was observed driving erratically, alternating daily routes and pulling to the side of the road, leading law enforcement to conclude he was "extremely surveillance conscious" and trying to evade detection. Ibid. Law enforcement determined apartment "D2" in the Chancellor Avenue building was likely being used as a "stash location," in furtherance of the drug distribution scheme. Ibid. Surveillance cameras in the common hallways captured defendant at the apartment. See id. at 3-4.

The Union County Prosecutor's Office (UCPO) outlined the evidence and applied "[p]ursuant to N.J.S.A. 2A:156A-9," New Jersey's Wiretapping and Electronic Surveillance Control Act, for a search warrant to "install[] a listening

device and a camera within [a]partment D2" and submitted a 127-page affidavit in support of that request. The warrant affidavit further stated:

> The purpose [of the application] is also to request search warrants for [the Chanceller Avenue residence] to be conducted in conjunction with the entry or entries authorized by the proposed order for the installation of the recording device and video camera used to capture oral communications and video images of [defendant and his co-defendants] and others within [a]partment D2 . . . .

The warrant was issued on April 17, 2009.[2] Id. at 4. Specifically, the warrant authorized officers to "search the premises," permitting law enforcement "to enter the premises . . . without[] first knocking and identifying [them]selves . . . as police officers and the purpose of being at the premises." The warrant provided that "in the event . . . [police] seize any . . . evidence" described in the addendum to the warrant, law enforcement must provide "a receipt for the property . . . seized to the person from whom it was taken or in whose possession it was found, or in the absence of such person to leave a copy of this warrant together with such receipt in or upon the . . . premises from which the property is taken." It then added

> authoriz[ation] to retain the search warrant and not turn over a copy of the search warrant or receipt of evidence

---

[2] The State describes this warrant as a "covert entry" warrant, and the warrant is referenced colloquially throughout the record as a "sneak and peek" warrant.

A-3416-22

seized to . . . Hassan, [defendant,] and Darrel Brignolle until [ninety] days after the sealing of the DVD(s) of the conversations over Wiretap14-09 or ten days after the arrest of . . . Hassan, [defendant,] or . . . Brignolle for their roles in this wiretap investigation, whichever comes first.

Additionally, the warrant provided the "search must be conducted contemporaneous with the entry into the apartment in order to prepare to install, . . . replace, repair, enhance, move and remove such equipment, if necessary, during the period of interception authorized by Wiretap 14-09."

We previously summarized what law enforcement found upon entering the apartment pursuant to the April 17 warrant:

> In the early morning hours of April 22, 2009, officers physically entered apartment D2. Once inside, law enforcement observed that "it appeared that no one was living there;" there was "little to no furniture," no toiletries, no silverware, no food, and no bed. As they entered the kitchen, they noticed there was powder covering the floor, the cupboards were open with "large rock-like substances in plastic bags," there was baking soda, Pyrex containers, a "scale with powder substance on it," knives and razor blades covered in powder, "[p]ackaging material, ziplock bags, plastic bags, [and] rubber gloves." Additionally, they saw white powder covering the stove. Although the officers believed they were witnessing the production of controlled dangerous substances (CDS), specifically cocaine, they did not do a "thorough and exhaustive search" for drugs as they were there to find a location to position the listening device.

5

[Id. at 4-5 (alterations in original).]

Law enforcement also "observed a rifle and a handgun in two different closets." Id. at 5. In determining "where to place the listening device," "[t]he officers recorded what they saw upon entering the apartment[,] . . . however, the video also captured the evidence found in the room. A sample of the powder and a rubber glove were taken for testing." Ibid.

Defendant was observed at the location several times in the days that followed, and law enforcement became concerned that "defendant and the other suspects were suspicious that they were being investigated." Ibid. Accordingly, arrest warrants were issued for numerous participants in the drug distribution enterprise, including defendant and Hassan. See ibid. As law enforcement approached to apprehend Hassan and defendant, both fled; Hassan "surrendered," but defendant evaded capture. Id. at 6.

A series of search warrants were also obtained for various premises, including the stash house and defendant's home and other regular locations, including "a search of his girlfriend's apartment, . . . [revealing] mail addressed to defendant, two cell phones, three pictures of defendant hidden in the refrigerator, and $5,000 in cash in the living room closet." Ibid. The search of another residence linked to the scheme revealed "defendant's insurance card,

A-3416-22

three cell phones, defendant's checkbook, defendant's BMW contract, defendant's driver's license, and $21,995 in cash hidden in two articles of clothing in the master bedroom closet and the hallway closet." Id. at 7.

A second search warrant was executed for apartment D2 on April 23, 2009, and law enforcement "again noticed the scarce furnishings, only a couch and chair, and noted the apartment did not have a refrigerator, dishes, kitchen utensils, toiletries, or clothing in the closets." Id. at 6. As we described:

> During their search, the police found: a .45 caliber automatic firearm loaded with four rounds, a 7.62 x 39 rifle with two magazine clips and thirty-three rounds, a Ruger gun box, respirator masks, a prescription morphine bottle with seven pills, a plastic bag containing sixteen bricks and one bundle of heroine, four plastic bags and four gloves, a .40 caliber firearm, a box of .9 millimeter Luger pistol cartridges with forty-five bullets, three Pyrex measuring cups, scales, ziplock bags containing suspected CDS, baking soda, a bottle of rum, a red lighter, knives, numerous black bags and paper plates, one kilo of suspected cocaine in two plastic bags, and numerous bags of a rock-like substance which was suspected to be cocaine. In a search of Hassan's residence, the police found: a box of checks in Hassan's name, Hassan's Visa card, Hassan's passport, keys to his vehicle, six empty holders for a cell phone's SIM card, seven new SIM cards in their holders, five cell phones, and $6011 in cash discovered in three different rooms in the home.
>
> [Id. at 6-7.]

A-3416-22

"[L]aw enforcement searched a vehicle associated with defendant" located at the building. Id. at 7. There they found "insurance papers issued to defendant, a Bank of America checkbook in defendant's name, receipts from BMW listing defendant as the customer, an Alamo rental receipt listing defendant as the renter, contractor estimate papers in defendant's mother's name, and a dry cleaning receipt in defendant's name." Id. at 7-8.

Thereafter,

> [t]esting on the seized materials from apartment D2 confirmed the substances were: 1.79 grams of morphine, 21.17 grams of heroin, and approximately 2,850 grams of cocaine. Fingerprints from Hassan and the other supplier were on numerous pieces of evidence. Defendant's fingerprint was found on one kilo wrapper.
>
> The lab testing also determined defendant's DNA was a match with a water bottle and latex gloves found in the apartment. Of the twenty-eight gloves that were analyzed, all "either contained a [DNA] profile that was a match to [defendant] or a profile where he could not be excluded as a contributor."
>
> [Id. at 8 (second and third alterations in original).]

Defendant surrendered roughly three years after he escaped his arrest. See id. at 11. He moved pretrial to suppress evidence seized as a result of the April 17 covert entry warrant. See ibid. Defense counsel asserted the warrant lacked probable cause. See ibid. Counsel further contended that the covert nature of

8

the warrant allowed for "maximum intrusion" into the privacy of a person's home by "looking around, picking up and seizing evidence and then leaving presumably without [the person] ever knowing." Defendant's trial counsel asserted a sneak and peek warrant required "a higher level of probable cause" than a regular search warrant, although he admitted there was no caselaw imposing that "higher level" probable cause requirement. The court denied the motion, finding the warrant was sufficiently supported by the requisite probable cause.

At trial, defendant, who appeared physically different in the years since the investigation, contended investigators misidentified him, and he was not involved in the distribution enterprise. Defense counsel sought to admit an invoice from a North Carolina Hilton hotel to refute information in a police report in which law enforcement indicated defendant was observed during police surveillance in Newark on the same date. In a hearing out of the presence of the jury, defense counsel produced a Hilton corporate representative who explained that Hilton hotels are franchises and not all hotels utilize the same practices. He also testified that although the invoice "look[ed] like a Hilton invoice," he could not say that it came from North Carolina.

A-3416-22

The State argued in opposition that the proposed testimony was irrelevant, as the proffered testimony came from Hilton representatives who had no "relationship at all with this [North Carolina] franchise, [who] would look at it and say, well, it looks like a Hilton logo." The State further argued that any person could have checked into the hotel, but neither the document nor the representative would be able to authenticate "whether ID was required or shown, whose ID was shown, [or] whether the person who showed up [wa]s the same person who paid for the room."

The trial court found the testimony and the invoice inadmissible, concluding the evidence was "very minimally probative and ha[d] the potential to lead to . . . confusion." It determined that the proposed witnesses were unable to authenticate that the invoice came from a franchise in North Carolina.

Approximately one month after trial, but prior to sentencing, on December 12, 2016, the trial court and counsel received an anonymous typewritten letter, purportedly written by a nameless juror.[3] The undated, unsigned letter, claimed the jurors discussed the case at a restaurant, "googled" defendant, and learned he was "a gang leader." The letter further stated that on one or two occasions,

---

[3] The letter was not included in the trial record and was not read into the record during the July 27, 2017 hearing. However, the letter is included in defendant's appendix on appeal.

numerous jurors witnessed defendant "in handcuffs" and noted "I believe it made . . . defendant look more menacing!" It also suggested that jurors "voted guilty just out of getting impatient with the process!" The letter concluded by suggesting the jurors be recalled and questioned about their deliberations.

A Union County Sheriff's Office "Incident Report" recounted receiving the "sealed evidence envelope from temporary evidence storage." "The . . . handwritten envelope [was] addressed to [the trial judge] from Ms. Honest" and listed a fictitious return address. The UCPO tested the letter and envelope and identified "latent prints." However, the prints either did "not contain sufficient ridge characteristics for comparison and were not examined further," or comparisons to known samples including court staff were "inconclusive." DNA testing of the envelope did not produce a match and the results were negative for "human saliva."

After receipt of the letter, defendant moved for a new trial, which was heard the day of defendant's sentencing. Defense counsel claimed the court erred by failing to voir dire the jury and requested that the court "conduct a voir dire with respect to all the jurors in order to establish . . . whether or not the letter was written by any of the[] jurors[,] [a]nd . . . whether or not the substance

of the letter was in fact correct." He argued the jurors were prejudiced against defendant because they saw him in handcuffs during trial.

The State indicated, "with no DNA on the seal of the envelope or insufficient DNA for testing from th[e] anonymous letter," the letter was not reliable and likely not sent by a juror. The trial court denied defendant's request, describing the letter as anonymous, undated, unsigned, and reflecting a fictitious return address, and further found the claim that defendant was seen in handcuffs was "not supported by anything in the record." Therefore, the court determined defendant had "not made the strong showing necessary to warrant the extraordinary procedure of post-trial interrogation of the retrial of jurors."

## B.

After his conviction, defendant raised numerous arguments on direct appeal. Id. at 24-25. Pertinent to the present appeal, we denied defendant's argument that the trial court erred in denying his motion to suppress evidence derived from the covert entry warrant. See id. at 27. We cited the expansive detail in the warrant application and concluded "the 127-page affidavit presented in support of the warrant provided ample evidence to support probable cause for the issuance of a sneak and peek warrant." Ibid.

12

We also determined sufficient evidence supported the jury's verdict, summarizing:

> The State presented surveillance footage of defendant frequenting the Chancellor Avenue residence for mere minutes, the evidence seized from apartment D2 including defendant's DNA on a water bottle, and the abundance of cash and numerous burner phones found at his home. Additionally, the State presented an expert on narcotics production and distribution. In his testimony, he discussed street-level, mid-level, and upper-level narcotics sales, the different forms of cocaine, the different types of packaging, the price, the physical description of a kilogram of drugs, the description of a location used solely for packaging drugs, the presence of face masks and latex gloves when dealing with drugs, and opined that people who distribute drugs usually use multiple cell phones and have a "stash location," and that transactions are done with cash.
>
> [Id. at 36.]

We denied defendant's muti-faceted argument that the trial court erroneously denied his motion for a new trial. See id. at 42. In relevant part, we determined the court did not err in finding inadmissible the invoice purporting to be the Hilton Hotel in North Carolina on a date in which one of the many police reports indicated defendant was seen in New Jersey. See id. at 17, 39. We discerned no error in the court's ruling, as the trial court properly found the invoice was "minimally probative," could not be authenticated, and

13

there was "no evidence to substantiate it was defendant who actually checked into and stayed in the room." Id. at 39.

We rejected defendant's argument that information in the anonymous letter "required the trial judge to recall the jurors and conduct a voir dire examination to determine if their verdict was tainted." Id. at 40. We determined the letter constituted "hearsay statements in an anonymous letter bearing a fictitious return address," and the court did not err in "declining to exercise the very extraordinary remedy of recalling the jury." Id. at 42-43.

C.

Defendant filed a petition for PCR, alleging ineffective assistance of both trial and appellate counsel, accompanied by a certification in support of his petition.

Relevant to this appeal, defendant argued that trial counsel failed to properly investigate defendant's "alibi" that he was in North Carolina at the Hilton Hotel on February 28, 2009, when one of the many police reports reflected that a detective was conducting surveillance and "observed defendant [and others] . . . in Newark." Defendant claimed he asked but trial counsel never sent "a private investigator [to] interview hotel personnel." He further asserted counsel was deficient for failing to call the detective to inquire about his claimed

14

sighting of defendant, and for issuing a late subpoena for that detective that was never properly served.

Defendant also claimed trial counsel was ineffective for failing to "properly argue[]" the issue surrounding the "constitutionality of a sneak-and-peek warrant." He claimed the warrant permitting covert entry into suspected "stash location" was not authorized under the New Jersey Constitution, and trial counsel and appellate counsel neglected to raise this specific challenge to the warrant's validity. He argued "the failure of . . . counsel to brief, file, and litigate a clearly meritorious motion to suppress meets both prongs of Strickland."[4]

Defendant also contended trial counsel failed to adequately investigate the anonymous "juror letter." He asserted counsel should have had "the letter . . . examined by a private laboratory, especially as no DNA analysis, despite request from one of the prosecutors, was conducted on the actual letter by the Union County Prosecutor's Forensic Laboratory."

The State argued that defendant's claim pertaining to the warrant was procedurally barred as "extensively li[ti]gated and upheld by the trial court and the Appellate Division." Substantively, the State argued that the delay in notice

---

[4] Strickland v. Washington, 466 U.S. 668, 687 (1984).

was authorized under the Wiretap Act. Further, it contended that the only arguable alteration in the warrant from New Jersey search warrant procedures was "the minor deviation [from Rule] 3:5-5, specifically that the person from whom the property was taken was not given a copy of the warrant or receipt from the property until [ninety] days after the sealing of the DVD wiretap." The State claimed any delay in notice was harmless as defendant eluded police for three years.

The State asserted any failure to investigate the alleged invoice from the North Carolina Hilton was "irrelevant," because this would not have been "alibi" evidence as the State never elicited testimony regarding "defendant's presence in New Jersey at that time." Further, the State contended the invoice could not be authenticated, and there was no showing of prejudice.

Finally, regarding the alleged juror's letter, the State contended the letter appeared to be "fraudulent" and defendant's claims were pure "speculation."

On June 9, 2023, the PCR court issued a written decision, denying defendant's PCR petition and request for an evidentiary hearing. Regarding the warrant arguments raised at trial and on direct appeal, the PCR court found the challenge barred as already raised and resolved on direct appeal. It noted that, based on defendant's petition, "nothing presented . . . would disturb the ruling

16

made by the [t]rial [j]udge or the Appellate Division." The court stated the affidavit contained sufficient probable cause, finding the affidavit "replete with observations of the target defendants . . . driving to [the Chancellor Avenue residence], remaining there for short periods of time, and then leaving, many times, which were observed during the surveillance."

The PCR court also determined "the trial court correctly found that the [hotel] invoice was []minimally probative and had the potential to lead [to] a lot of confusion and open the door to evidence that the court had already precluded." The court found defendant failed to present any evidence to support that a representative of North Carolina Hilton Hotels would be able to authenticate the invoice or show defendant was actually in North Carolina. Further, even assuming counsel could have further investigated the invoice, the court found no prejudice as there was no indication that the result of any theoretical investigation would have altered the outcome at trial, as there was no basis to conclude any other officers misidentified defendant during other relevant surveillance.

Regarding the anonymous letter, the court cited this court's opinion and "f[ound] no reason to deviate" from our determination deferring to the trial

17

judge's "unique perspective," concurring the letter amounted to hearsay and no further inquiry of the jury was warranted or appropriate.

On motion for reconsideration, defendant contended the PCR court did not adequately address the alleged constitutional issue in the "sneak and peek" warrant, counsel's failure to hire an effective forensic expert to analyze the juror letter, and counsel's failure to investigate the alleged North Carolina trip.

The court agreed it had not fully addressed certain issues, and supplemented its earlier findings, again denying PCR. In addressing the warrant challenge, the court determined that, even assuming the constitutionality of the covert entry warrant was not squarely raised by trial or appellate counsel, defendant made no showing that such an argument would have succeeded, as any arguable failure to comply with New Jersey law related to delayed notice of the warrant's execution was of "de minimus consequence because [d]efendant had eluded police for four years."

The court again rejected defendant's claim regarding the failure to investigate the North Carolina invoice as a bald assertion, that, even if true, was also of "de minimus consequence because, even with a witness attesting to his having been in a hotel, the [S]tate offered evidence beyond one day's worth of

18

surveillance." The judge similarly found no merit in the unsupported claim that counsel failed to employ forensic testing and experts to challenge the evidence.

## II.

Defendant raises the following claims on appeal:

POINT I

BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL, THE PCR COURT ERRED IN DENYING THE PCR WITHOUT HOLDING AN EVIDENTIARY HEARING. U.S. Const. amend. VI; N.J. Const. art. I, par 10.

1. Counsel Was Ineffective for Failing to Challenge The "Sneak and Pe[e]k" Procedure as In Violation of The New Jersey Constitution, and the PCR Court Erred in Denying the PCR Without an Evidentiary Hearing.

A. Introduction.

B. Sneak and Peek Warrants Are Only Authorized by Federal Law Under Particular Circumstances.

C. Sneak and Peek Warrants Are Not Recognized as a Valid Investigatory Tactic In New Jersey.

D. The New Jersey Constitution Provides Greater Protection Than the Federal Constitution, Especially in The Search and Seizure Context, and Sneak and Peek Warrants Violate The New Jersey Constitution.

E. The PCR Court's Rejection of this Claim Without Holding an Evidentiary Hearing was Erroneous.

19

2. Counsel Was Ineffective for Failing to Investigate or Present Potential Alibi Evidence, Or to Use That Evidence to Impeach the Credibility of a Detective, and the PCR Court Erred in Denying the PCR Without an Evidentiary Hearing.

3. Counsel Was Ineffective for Failing to Have the "Juror Letter" Independently Tested by DNA and Fingerprint Experts, and the PCR Court Erred in Denying the PCR Without an Evidentiary Hearing.

## III.

In the absence of an evidentiary hearing, we may review without deference "both the factual findings and legal conclusions of the PCR court." State v. Harris, 181 N.J. 391, 421 (2004). We review with deference a trial court's denial of a motion for reconsideration and disturb those findings only upon an abuse of discretion. See State v. Puryear, 441 N.J. Super. 280, 293-94 (App. Div. 2015).

New Jersey's PCR petition serves as an "analogue to the federal writ of habeas corpus." State v. Preciose, 129 N.J. 451, 459 (1992). "[N]either a substitute for direct appeal" for those criminally convicted nor a vehicle to re-litigate matters already resolved on their merits, PCR proceedings can offer the best opportunity for ineffective assistance claims to be reviewed. Ibid. When petitioning for PCR, a defendant must establish, "by a preponderance of the credible evidence," entitlement to the requested relief. Ibid. To sustain this

burden, defendants must articulate specific facts, "which, if believed, would provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992).

Claims are procedurally barred if they could have been made on direct appeal, R. 3:22-4, or are made after a prior adjudication on the merits, see R. 3:22-5; see also State v. McQuaid, 147 N.J. 464, 483 (1997) (recognizing "a defendant may not use a petition for [PCR] as an opportunity to relitigate a claim already decided on the merits").  "A ground could not reasonably have been raised in a prior proceeding only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence." R. 3:22-4(a)(3).

The mere raising of a claim for PCR does not entitle the defendant to an evidentiary hearing.  See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  Rather, "[i]f the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." State v. Marshall, 148 N.J. 89, 158 (1997).

The United States Supreme Court in Strickland, 466 U.S. at 687, established a two-part test to determine whether a defendant has been deprived

of the effective assistance of counsel, which the New Jersey Supreme Court adopted in State v. Fritz, 105 N.J. 42, 58 (1987), under New Jersey's Constitution. Failure to establish either prong requires the denial of a PCR petition founded on an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700.

To satisfy the first prong, defendant must demonstrate counsel's performance was deficient and "fell below an objective standard of reasonableness" and "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687-88. Defendants "must allege specific facts and evidence supporting [their] allegations." State v. Porter, 216 N.J. 343, 355 (2013). "Bald assertions" will not suffice. Cummings, 321 N.J. Super. at 170. Further, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Under Strickland's second prong, a defendant must "affirmatively prove" there exists "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  State v. Gideon, 244 N.J. 538, 551 (2021) (quoting Strickland, 466 U.S. at 694).  "Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient."  State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted); see also State v. Alvarez, 473 N.J. Super. 448, 455-56 (App. Div. 2022).  Ultimately, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if [it] had no effect on the judgment."  Strickland, 466 U.S. at 691.  Errors with "some conceivable effect on the outcome" fall short of warranting relief.  Id. at 693.

Against this backdrop we first address and reject defendant's claims that both trial and appellate counsel failed to adequately challenge the warrant's constitutionality.

Trial counsel filed a motion to suppress, challenging the validity of the warrant and specifically its covert entry component.  Defendant's appellate counsel challenged the validity of the warrant, and defendant filed a supplemental submission specifically challenging the constitutionality of the

warrant. We considered defendant's arguments on direct appeal and found the warrant was sufficiently supported by probable cause. Both trial and appellate counsels capably litigated the validity of the warrant. Thus, we discern no error in the PCR court's determining that defendant's claim is procedurally barred, see R. 3:22-4 and -5, or in finding defendant failed to make a sufficient substantive showing that trial or appellate counsel was deficient in challenging the warrant or that any prejudice resulted from counsels' otherwise vigorous arguments concerning the warrant.

Strategically, trial counsel elected to principally challenge the sufficiency of the warrant affidavit, but also argued proof greater than probable cause should have anchored the covert entry. The trial court rejected that challenge, recognizing there was no precedential authority for a heightened standard. Appellate counsel challenged on direct appeal the denial of the motion to suppress and the validity of the warrant. We are satisfied defendant failed to make even a preliminary showing that counsel fell below the threshold of effective advocacy. See State v. Morrison, 215 N.J. Super. 540, 549 (App. Div. 1987) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)) ("[A]ppellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant."); see also State v. Echols, 199 N.J. 344, 358 (2009) (mere

dissatisfaction with a "counsel's exercise of judgment" is insufficient to warrant overturning a conviction (quoting State v. Castagna, 187 N.J. 293, 314 (2006))). Further, even assuming for purposes of argument that there was some flaw in the chosen strategy, defendant failed to make a sufficient showing of a probability that a different legal challenge would have succeeded or changed the outcome.

We similarly perceive no error in the PCR court's determination that defendant raised only "bald assertions" and failed to show prejudice regarding trial counsel's alleged deficient investigation of the hotel invoice. Defendant offered no information to suggest he could produce a witness to demonstrate he was in North Carolina on the date the police report noted his physical presence in New Jersey. Importantly, even assuming defendant produced a witness stating he was in North Carolina on that singular date, he fails to show that information would have the capacity to lead to a changed outcome, given the ample evidence of his participation in the distribution enterprise.

Finally, the PCR court properly denied an evidentiary hearing regarding trial counsel's failing to engage a forensic expert to examine the "anonymous" juror letter. Defendant's petition amounted to speculation, undermined by the record. Defendant's petition fell fatally short of warranting relief, particularly

25

given the extraordinary measure of probing a jury's deliberative process post-verdict. <u>See</u> <u>State v. Young</u>, 181 N.J. Super. 463, 468-69 (App. Div. 1981).

To the extent we have not addressed any additional arguments raised by defendant, we determine they lack sufficient merit to warrant further discussion in a written opinion. <u>See</u> <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-3416-22